# EXHIBIT 1

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF RICHMOND**

-------------------------------------------------------------------------------X

THE ESTATE OF JUSTINE MARIE ALIOTTA, JOANNE ALIOTTA individually and as administratrix of the Estate of JUSTINE MARIE ALIOTTA, deceased, and JULISSA CECELIA TORRES an infant by her guardian JOANNE ALIOTTA, on behalf of themselves and PLAINTIFF CLASS consisting of all other persons in New York so situated,

**Index No.**

**VERIFIED COMPLAINT**

Plaintiffs,

-against-

PURDUE PHARMA, INC.;
PURDUE PHARMA L.P.;
THE PURDUE FREDERICK COMPANY, INC.;
ENDO HEALTH SOLUTIONS, INC.;
ENDO PHARMACEUTICALS, INC.;
JOHNSON & JOHNSON;
JANSSEN PHARMACEUTICALS, INC. f/k/a
ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC.;
TEVA PHARMACEUTICAL INDUSTRIES, LTD.;
TEVA PHARMACEUTICALS, USA, INC.;
CEPHALON, INC.;
ALLERGAN PLC f/k/a ACTAVIS PLC f/k/a
WATSON PHARMACEUTICALS, INC.;
ALLERGAN FINANCE, LLC;
WATSON LABORATORIES, INC.;
ABBVIE INC.;
AMERISOURCEBERGEN DRUG CORPORATION;
MCKESSON CORPORATION;
CARDINAL HEALTH, INC.;
STATEN ISLAND UNIVERSITY HOSPITAL;
JOHN AND JANE DOE PHYSICIANS 1 THROUGH 10, who prescribed, or over prescribed, without medical necessity prescription opioids and/or in the alternative prescribed prescription opioids carelessly, unskillfully, in a grossly negligent manner, and not in accordance with accepted standards of medical care, diagnosis, treatment and services in the community;
CVS HEALTH CORPORATION;
DUANE READE, INC.;
WALGREEN CO.;
JOHN AND JANE DOE PHARMACIES 1 THROUGH 10, who filled opioid prescriptions carelessly, unskillfully, in a grossly negligent manner, and not in accordance with accepted standards of



1 of 142

medical care, diagnosis, treatment and services in the community;
all whose true names are unknown,

Defendants.

--------------------------------------------------------------------------------X

**YOU ARE HEREBY SUMMONED** to answer the complaint of Plaintiffs, THE ESTATE OF JUSTINE MARIE ALIOTTA (hereinafter "ESTATE"), JOANNE ALIOTTA individually (hereinafter "ALIOTTA"), JOANNE ALIOTTA as administratrix of the Estate of JUSTINE MARIE ALIOTTA (hereinafter "DECEDENT ALIOTTA"), deceased, and JULISSA CECELIA TORRES (hereinafter "TORRES") an infant by her guardian JOANNE ALIOTTA (hereinafter collectively "ESTATE PLAINTIFFS"), as and for their complaint against the defendants, PURDUE PHARMA, INC., PURDUE PHARMA L.P., THE PURDUE FREDERICK COMPANY, INC., (hereinafter collectively the "PURDUE DEFENDANTS"), ENDO HEALTH SOLUTIONS, INC. ENDO PHARMACEUTICALS, INC. (hereinafter collectively the "ENDO DEFENDANTS"), JOHNSON & JOHNSON, JANSSEN PHARMACEUTICALS, INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. (hereinafter collectively the "JOHNSON & JOHNSON DEFENDANTS"), TEVA PHARMACEUTICAL INDUSTRIES, LTD., TEVA PHARMACEUTICALS, USA, INC., CEPHALON, INC. (hereinafter collectively the "TEVA DEFENDANTS"), ALLERGAN PLC f/k/a ACTAVIS PLC f/k/a WATSON PHARMACEUTICALS, INC., ALLERGAN FINANCE, LLC, WATSON LABORATORIES, INC., ABBVIE INC. (hereinafter collectively the "ALLERGAN DEFENDANTS" and hereinafter collectively with the above DEFENDENTS the "MANUFACTURING DEFENDANTS"), AMERISOURCEBERGEN DRUG CORPORATION, MCKESSON CORPORATION, CARDINAL HEALTH, INC.; (hereinafter collectively "DISTRIBUTING DEFENDANTS"), STATEN ISLAND UNIVERSITY HOSPITAL (hereinafter "SIUH"), CVS



2 of 142

HEALTH CORPORATION, DUANE READE, INC., WALGREEN CO., (hereinafter collectively "PHARMACY DEFENDANTS"), JOHN AND JANE DOE PHYSICIANS 1 THROUGH 10 (hereinafter collectively referred to with SIUH as "PHYSICIAN DEFENDANTS"), all whose true names are unknown, who prescribed, or over prescribed, without medical necessity prescription opioids and/or in the alternative prescribed prescription opioids carelessly, unskillfully, in a grossly negligent manner, and not in accordance with accepted standards of medical care, diagnosis, treatment and services in the community; JOHN AND JANE DOE PHARMACIES 1 THROUGH 10 (hereinafter referred to collectively with CVS HEALTH CROPORATION, DUANE READE, INC., and WALGREEN CO as "PHARMACY DEFENDANTS"), all whose true names are unknown, who filled opioid prescriptions carelessly, unskillfully, in a grossly negligent manner, and not in accordance with accepted standards of medical care, diagnosis, treatment and services in the community (all defendants hereinafter collectively referred to as "DEFENDANTS"), alleges and sets forth the following upon information and belief:

## I. INTRODUCTION & NATURE OF THIS ACTION

1. Opioids are powerful narcotic painkillers that include non-synthetic, partially synthetic, and fully synthetic derivatives of the opium poppy.
2. Common opioids include morphine, methadone, oxycodone, hydrocodone, codeine, and fentanyl.
3. Common brand names for these drugs include Vicodin, Percocet, and OxyContin.
4. Heroin, which is common street narcotic, is also classified as an opioid.
5. Opioids bind to opioid receptors in the human nervous system eliciting a euphoric response by stimulating pleasure centers in the brain.



3 of 142

6. This euphoric response allows opioids to effectively mask pain, but it also causes the drugs to be highly addictive.
7. Prescription opioids with the highest potential for addiction are categorized under Schedule II of the Controlled Substances Act (hereinafter referred to as "CSA").
8. In Fact, the United States Drug Enforcement Agency's ("DEA") website states, "[s]ubstances in…schedule [II] have a high potential for abuse which may lead to severe psychological or physical dependence.
9. Opioid drugs cannot be lawfully obtained unless they are medically necessary and require a valid prescription form a prescribing doctor.
10. Because opioids are highly addictive, prevailing medical norms dictated that they should not be prescribed for chronic pain.
11. The fact is that opioid prescriptions are so potent that they inevitably overcome the will of many users, leading to addiction, overdose and death.
12. Before the 1990's, generally accepted standards of medical practice dictated that opioids should be used only for cases of acute pain, surgery recovery, cancer treatment, or end-of-life palliative care.
13. In addition, at that time, there was widespread medical consensus that opioids should not be used to treat chronic pain because there was a lack of evidence that opioids improved a patients' ability to overcome pain and because of the serious risk of addiction and other side effects.
14. In the limited cases where patients were prescribed opioids, the drugs ordinarily were administered in closely supervised environments, such as a hospital after surgery, or in a hospice facility.



4 of 142

15. These closely supervised conditions mitigated the risk that patients might misuse opioids, and they allowed doctors to monitor patients for signs of potential addiction or dependence.

16. Despite the prevailing medical norms, the MANUFACTURING DEFENDANTS viewed the medical community's aversion to prescribing opioids as an impediment to increased profits from additional opioid sales.

17. Further, although aware that prescription opioids can cause addiction, overdose, and deaths, the MANUFACTURING DEFENDANTS devised a scheme to misrepresent the risks and benefits of opioids to physicians and patients in an effort to increase prescriptions to chronic-pain patients.

18. The MANUFACTURING DEFENDANTS, via their owners and management, with scientific precision, designed, financed and waged a campaign, both pervasive and targeted, to mislead doctors and patients into believing that their old and newly formulated drugs were safe and/or safer to treat even minor pain.

19. To further their scheme and plan, MANUFACTURING DEFENDANTS employed the following various misrepresentations concerning opioid treatment: (1) that the risk of addiction from chronic opioid therapy was low; (2) that such risk could be easily identified and managed; (3) that signs of addiction were "pseudoaddiction," requiring more opioids; (4) that withdrawal could be avoided by tapering; (5) that dosages could be increased without additional risks; (6) that long-term opioid use improved functioning; (7) that alternative forms of pain relief were riskier; (8) that OxyContin provided twelve hours of pain relief; and, (9) that newer formulas of certain opioids successfully deterred abuse.



5 of 142

20. All the foregoing representations are false.
21. Despite knowing these claims to be false; MANUFACTURING DEFENDANTS nevertheless set out to convince physicians, patients, and the public at large of the "truth" of each of these propositions in order to expand the market for their opioids.
22. In short, MANUFACTURING DEFENDANTS place greater import on their profits than the health, wellbeing and lives of our family members.
23. The DISTRIBUTING DEFENDANTS distributed opioids in a careless, reckless and intentional manner to increase their profits, and failed and/or refused to monitor, investigate, or report suspicious orders of prescription opioids, as required by law.
24. As a result the DISTRIBUTING DEFENDANTS flooded communities with opioids.
25. DISTRIBUTING DEFENDANTS also knew that they were distributing too many opioids, creating addictions and a black market for opioids that further fueled the addicts they created.
26. As a result of all of the foregoing, physicians in general and STATEN ISLAND UNIVERSITY HOSPITAL and JOHN AND JANE DOE PHYSICIANS in particular, failed to properly monitor the administration of opioid medications, overprescribed opioid medications, failed to properly analyze the background and history of their patients, and went against previously medical norms and contributed to the opioid crisis.
27. Further the PHARMACY DEFENDANTS as well as JOHN AND JANE DOE PHARMACIES eagerly filled unnecessary prescriptions, selling out the wellbeing and safety or their patients for profits.
28. As a result of the actions of the DEFENDANTS, prescriptions of opioid medications began to rise in the 1990's.



6 of 142

29. This resulted in over 218,000 deaths caused by prescription opioids (reported from 1999 to 2017, with the rate of deaths being five times (5x) greater in 2017 than in 1999.

30. Said statistic does not include the hundreds of thousands who died from addiction related illness caused and/or facilitated by prescription opioids, which were often taken in conjunction with illicit drugs.

31. Currently, on average, 130 Americans die every day from an opioid overdoes.

32. In 2016 more than 1,000 people in New York City died from an opioid-related drug overdose, the highest year on record.

33. Things only worsened in 2017, when more New Yorkers died from opioid overdoses than from car accidents and homicides combined.

34. In addition to the tragic loss of life and the heartbreaking impact on children and loved ones, some estimates place the economic costs of the epidemic at approximately 500 billion dollars per year.

35. Without DEFENDANTS' actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

36. The Plaintiffs seek redress under New York state statutory and common law for, *inter alia*, the wrongful death of JOANNE ALIOTTA (hereinafter "JOANNE) who was a victim of (among other things) of the illegal, willful, wanton, negligent and intentional acts and omissions of the DEFENDANTS, as well as all other persons in New York so situated, who have subcommand to the an opioid related death as a result of opioid prescription medication.

## II. <u>THE PARTIES</u>



7 of 142

## A. PLAINTIFFS

37. ALIOTTA is a natural person and resident and citizen of the State of New York, Richmond County, and the surviving natural mother of the DECEDENT ALIOTTA and a member of PLAINTIFF CLASS.

38. ESTATE is the estate of the DECEDENT ALIOTTA filed and situated in the Surrogates Court, State of New York, Richmond County.

39. ALIOTTA also brings this suit in her capacity as Administratrix of the ESTATE, having been previously appointed as Administratrix pursuant to a decree from the Surrogates Court, State of New York, Richmond County.

40. TORRES is the natural daughter of the DECEDENT ALIOTTA, and an infant and resident and citizen of the State of New York, Richmond County, pursuing her claims herein by her guardian ALIOTTA.

41. The Plaintiffs ALIOTTA, ESTATE, and TORRES are hereinafter collectively referred to as the “ESTATE PLAINTIFFS.”

42. “PLAINTIFF CLASS” is a class of all persons who are or have been residents of the state of New York at any relevant time prior hereto, who have been damaged as a result of the wrongful death of persons who were prescribed and who used opioid medication, which were the cause of their addictions and/or subsequent deaths, including but not limited any estates of said persons and the next of kin of those who have died.

## B. “MANUFACTURING DEFENDANTS”

43. At all relevant times, MANUFACTURING DEFENDANTS marketed, advertised, promoted, sold, and distributed opioid products in the State of New York and to New



8 of 142

York residents, citizens, and businesses, including the DECEDENT ALIOTTA and PLAINTIFF CLASS herein.

**i. The "PURDUE DEFENDANTS"**

44. Defendant Purdie Pharma, Inc. is a New York corporation with its principal place of business in Connecticut.

45. Defendant Purdue Pharma L.P. is a limited partnership organized under the laws of the State of Delaware with its principal place of business in Connecticut.

46. Defendant Purdue Frederick Company, Inc. is a Delaware corporation with its principal place of business in Connecticut.

47. At all relevant times, the PURDUE DEFENDANTS acted in coordination and/or in concert with one another, and/or acted in concert with one another, either as the agent and/or principle of the other, and/or with cooperation, agreement, and understanding, including that the methods and actions of marketing, advertising, selling and distributing opioid medications were being taken to benefit the PURDUE DEFENDANTS, such that they are jointly and severally liable for damages set forth herein which resulted from their conduct and omissions (as set forth herein).

48. PURDUE DEFENDANTS introduced their opioid drug, OxyContin, in 1996.

49. OxyContin's sole active ingredient is oxycodone, a molecule nearly identical to heroin, an illegal and highly addictive drug.

50. In 2010, PURDUE DEFENDANTS released a supposedly "abuse deterrent" version of OxyContin and withdrew the original formulation from the market.

51. The release of this new formulation allowed PURDUE DEFENDANTS to avoid competition from generic equivalent of the original OxyContin.



9 of 142

52. PURDUE DEFENDANTS later introduced another powerful opioid, Butrans, which releases opioids into the body from a skin patch.

53. Thereafter the PURDUE DEFENDANTS introduced yet another opioid marketed as Hysingla.

54. PURDUE DEFENDANTS manufactured, marketed and sold, and continue to sell, several opioids, including, but not limited to, OxyContin, MS Cantin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER.

55. PURDUE DEFENDANTS promote, market, advertise, sold and/or distributed many, if not all, of its opioid based drugs in New York.

56. OxyContin is PURDUE DEFENDANTS best-selling opioid. Since 2009, PURDUE DEFENDANTS' annual sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up four-fold from its 2006 sales of $800 million.

57. OxyContin constitutes roughly 30% of the entire market for analgesic drugs (painkillers).

58. At all times, the PURDUE DEFENDANTS acted in coordination with one another, and/or with wholly owned subsidiaries, and with each of their cooperation, agreement, and understanding that these methods and actions were being taken to benefit of the PURDUE DEFENDANTS, such that they are jointly and severally liable for the conduct of one another.

**ii. <u>The "ENDO DEFENDANTS"</u>**

59. Defendant Endo Health Solutions Inc. (hereinafter "EHS") is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.



10 of 142

60. Defendant Endo Pharmaceuticals Inc. (hereinafter "EPI") is a wholly owned subsidiary of EHS and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

61. At all relevant times EHS and EPI (collectively hereinafter "ENDO DEFENDANTS") acted in coordination and/or in concert with one another, and/or acted in concert with one another, or their subsidiaries, either as the agent and/or principle of the other, and/or with cooperation, agreement, and understanding, including that the methods and actions of marketing, advertising, selling and distributing opioid medications were being taken to benefit the ENDO DEFENDANTS, such that they are jointly and severally liable for damages set forth herein which resulted from their conduct and omissions (as set forth herein).

62. ENDO DEFENDANTS manufacture the opioids Percocet, Opana, and Percodan.

63. At all relevant times herein, ENDO DEFENDANTS promoted, marketed, advertised and sold opioids in New York, including Percocet and Opana, and previously Opana ER.

64. At all relevant times herein, ENDO DEFENDANTS developed, marketed, and sold prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the United States and New York.

65. Opioids made up roughly $403 million of ENDO DEFENDANTS' overall revenues of $3 billion in 2012.

66. Opana ER yielded $1.25 billion in revenue from 2009 through 2013, and it accounted for 10% of ENDO DEFENDANTS' total revenue during that period.

67. At all relevant times herein, ENDO DEFENDANTS also manufactured and sold generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in



11 of 142

the United States and New York, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

68. On June 8, 2017, the FDA called for the ENDO DEFENDANTS to remove Opana ER from the market, concluding that the risks of the drug outweigh its benefits.

### iii. The "JOHNSON & JOHNSON DEFENDANTS"

69. Defendant JOHNSON & JOHNSON ("JOHNSON") is a New Jersey corporation with its principal place of business in New Jersey.

70. Defendant JANSSEN PHARMACEUTICALS, INC. ("JPI") is a Pennsylvania corporation with its principal place of business in New Jersey.

71. JPI is a wholly owned subsidiary of JOHNSON, which controls the sale and development of JPI's drugs.

72. JANSEN was formerly known as Ortho-McNeil-Janssen Pharmaceuticals, Inc.

73. At all relevant times, the profits of JPI inured to JOHNSON's

74. At all relevant times JPI and JOHNSON (collectively hereinafter "JOHNSON & JOHNSON DEFENDANTS") acted in coordination and/or in concert with one another, and/or acted in concert with one another, and/or their subsidiaries, either as the agent and/or principle of the other, and/or with cooperation, agreement, and understanding, including that the methods and actions of marketing, advertising, selling and distributing opioid medications were being taken to benefit of the JOHNSON & JOHNSON DEFENDANTS, such that they are jointly and severally liable for damages set forth herein which resulted from their conduct and omissions (as set forth herein).



12 of 142

75. At all relevant times herein, JOHNSON & JOHNSON DEFENDANTS manufactured the opioids Duragesic and Tapentadol IR and previously manufactured the opioids Nucynta and Nucynta ER.

76. At all relevant times herein, JOHNSON & JOHNSON DEFENDANTS promoted, marketed, advertised, and sold opioids in New York.

77. Until 2015, JOHNSON & JOHNSON DEFENDANTS promoted, marketed, advertised, and sold the opioids Nucynta and Nucynta ER in New York.

78. Together, Nucynta and Nucynta ER accounted for $172 million of JOHNSON & JOHNSON DEFENDANTS sales in 2014.

79. Before 2009, Duragesic accounted for at least $1 billion in annual sales for the JOHNSON & JOHNSON DEFENDANTS.

**<u>The "TEVA DEFENDANTS"</u>**

80. TEVA PHARMACEUTICAL INDUSTRIES, LTD. ("TEVA LTD") is an Israeli corporation with its principal place of business in Petah Tikva, Israel.

81. TEVA PHARMACEUTICALS, USA, INC. ("TEVA USA") is a Delaware corporation with its principal place of business in Pennsylvania.

82. CEPHALON, INC. ("CEPHALON") is a Delaware corporation with its principal place of business in Pennsylvania.

83. In October of 2011, TEVA USA acquired CEPHALON.

84. Defendant TEVA USA is a wholly owned subsidiary of TEVA LTD.

85. At all relevant times, TEVA LTD, TEVA USA, and CEPHALON (hereinafter collectively referred to as "TEVA DEFENDANTS") acted in coordination and/or in concert with one another, and/or acted in concert with one another, or their subsidiaries,



13 of 142

either as the agent and/or principle of the other, and/or with cooperation, agreement, and understanding, including that the methods and actions of marketing, advertising, selling and distributing opioid medications were being taken to benefit of the TEVA DEFENDANTS, such that they are jointly and severally liable for damages set forth herein which resulted from their conduct and omissions (as set forth herein).

86. Upon information and belief, TEVA LTD directs the business practices of CEPHALON and TEVA USA, and the profits of said companies inure to the benefit of their controlling shareholder: TEVA LTD.

87. CEPHALON manufactures, promotes, sells, and distributes opioids such as Actiq and Fentora in the United States and New York.

88. The FDA only approved Actiq and Fentora for the "management of breakthrough cancer pain in patients 16 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain.".

89. In 2008, CEPHALON pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act (hereinafter referred to as “FDCA”) for its misleading promotion of Actiq and two other drugs and agreed to pay $425 million in fines.

90. TEVA LTD conducts all sales and marketing activities for CEPHALON in the United States through TEVA USA and has done so since its October 2011 acquisition of CEPHALON.

91. TEVA LTD and TEVA USA hold out Actiq and Fentora as Teva products to the public.

92. TEVA USA sells all former CEPHALON branded products through its “specialty medicines” division.



14 of 142

93. The FDA-approved prescribing information and medication guide, which is distributed with CEPHALON opioids, discloses that the guide was submitted by TEVA USA, and directs physicians to contact TEVA USA to report adverse events.

94. At all relevant times herein mentioned, all of CEPHALON's promotional websites, including those for Actiq and Fentora, display TEVA LTD's logo.

95. TEVA LTD's financial reports list CEPHALON's and TEVA USA's sales as its own, and its year-end report for 2012, the year immediately following the CEPHALON acquisition, attributed a 22% increase in its specialty medicine sales to the inclusion of a full year of CEPHALON's specialty sales, including inter alia sales of Fentora.

96. Through interrelated operations like these, TEVA LTD operates in the United States through its subsidiaries CEPHALON and TEVA USA.

97. As a result, the United States has become TEVA LTD's largest global market representing 53% of its global revenue in 2015.

98. Upon information and belief if TEVA USA and CEPHALON did not exist, TEVA LTD would directly conduct the business of said companies in the United States.

99. At all relevant times herein mentioned, the TEVA DEFENDANTS, individually and/or through subsidiaries, promoted, marketed, advertised, and sold opioid medications in New York and nationwide, including generic Oxycontin.

100. At all times, the TEVA DEFENDANTS acted in coordination with one another, and/or with wholly owned subsidiaries, and with each of their cooperation, agreement, and understanding that these methods and actions were being taken to benefit of the TEVA DEFENDANTS, such that they are jointly and severally liable for the conduct of one another.



15 of 142

**v. The "ALLERGAN DEFENDANTS"**

101. ACTAVIS PLC ("ACTAVIS") was a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland.

102. In March of 2015, ACTAVIS acquired ALLERGAN PLC ("ALLERGAN"), and the combined company changed its name to ALLERGAN PLC in June 2015.

103. ALLERGAN PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland.

104. WATSON LABORATORIES, INC. ("WATSON LABS") is a Nevada corporation with its principal place of business in Corona, California, and is a wholly owned subsidiary of ALLERGAN.

105. Defendant ALLERGAN FINANCE, LLC ("ALLERGAN FINANCE") is a Nevada limited liability company located in New Jersey and is a wholly owned subsidiary of ALLERGAN.

106. At all relevant times herein mention, the ALLERGAN DEFENDANTS manufactured the opioids Kadian and Norco.

107. At all relevant times herein mention, ALLERGAN promoted, marketed, advertised, and sold opioids in New York, including Kadian and Norco.

108. At all relevant times herein mention, ALLERGAN also sold generic versions of Kadian, Duragesic, and Opana.

109. At all relevant times herein mentioned, ACTAVIS manufactured, promoted, sold, and distributed opioids, including the branded drugs Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana, in the United States and New York.



16 of 142

110. ACTAVIS acquired the rights to Kadian from King Pharmaceuticals, Inc., on December 30, 2008 and began marketing Kadian in 2009.

111. At all relevant times, the ALLERGAN DEFENDANTS acted in coordination and/or in concert with one another, and/or acted in concert with one another, or their subsidiaries, either as the agent and/or principle of the other, and/or with cooperation, agreement, and understanding, including that the methods and actions of marketing, advertising, selling and distributing opioid medications were being taken to benefit of the ALLERGAN DEFENDANTS, such that they are jointly and severally liable for damages set forth herein which resulted from their conduct and omissions (as set forth herein).

112. On or about June 25, 2019, ABBVIE INC. ("ABBVIE INC.") agreed to acquire ALLERGAN and has assumed the liabilities and damages of the Plaintiffs.

**C. "DISTRIBUTING DEFENDANTS"**

113. At all relevant times, DISTRIBUTING DEFENDANTS distributed and sold opioid products in the State of New York and to New York residents, citizens, and businesses, including the DECEDENT ALIOTTA and PLAINTIFF CLASS herein.

**i. "AMERISOURCE"**

114. AMERISOURCE BERGEN DRUG CORPORATION ("AMERISOURCE") is a Delaware Corporation with its principal place of business in Chesterbrook, Pennsylvania.

115. Amerisource distributes pharmaceuticals to retail pharmacies and institutional providers across the United States, including New York and Richmond County.

116. The drugs distributed by Amerisource include powerful, addictive opioids, such as oxycodone and hydrocodone.

**ii. "CARDINAL"**



17 of 142

117. CARDINAL Health, Inc. ("CARDINAL") is an Ohio Corporation with its principal place of business in Dublin, Ohio.

118. CARDINAL distributes pharmaceuticals to retail pharmacies and institutional providers across the United States, including New York and Richmond County.

119. The drugs distributed by CARDINAL include powerful, addictive opioids, such as oxycodone and hydrocodone.

**iii. "MCKESSON"**

120. Defendant MCKESSON CORPORATION ("MCKESSON") is a Delaware corporation with its principal place of business in California.

121. MCKESSON distributes substantial amounts of prescription opioids to providers and retailers in the United States and New York.

122. The drugs distributed by MCKESSON include powerful, addictive opioids, such as oxycodone and hydrocodone.

**D. TREATING PHYSICIANS AND INSTITUTIONS**

**i. "STATEN ISLAND UNIVERSITY HOSPITAL"**

123. At all times hereinafter mentioned the defendant, Staten Island University Hospital, maintained a hospital for the treatment of patients in the State of New York, county of Richmond.

124. That at all times hereinafter mentioned, and upon information and belief, the defendant, Staten Island University Hospital employed medical doctors and medical professionals duly licensed to practice medicine in the State of New York, and who did practice medicine at the hospital (said professionals and hospital hereinafter collectively referred to as "SI UNIVERSITY HOSPITAL").



18 of 142

**ii. "JOHN AND JANE DOE PHYSICIANS 1 THROUGH 10"**

125. JOHN AND JANE DOE PHYSICIANS 1 THROUGH 10 ("JJD PHYSICIANS"), are physicians who prescribed, or over prescribed, without medical necessity prescription opioids and/or in the alternative prescribed prescription opioids carelessly, unskillfully, in a grossly negligent manner, and not in accordance with accepted standards of medical care, diagnosis, treatment and services in the community.

**E. "PHARMACY DEFENDANTS"**

**i. "CVS HEALTH CORPORATION"**

126. Defendant CVS HEALTH CORPORATION ("CVS HEALTH") is a Delaware corporation with its principal executive offices located at One CVS Drive, Woonsocket, Rhode Island.

127. CVS HEALTH was founded in 1892 and is headquartered in Woonsocket, Rhode Island.

128. The Company was formerly known as CVS Caremark Corporation and changed its name to CVS Health Corporation in September 2014.

129. CVS HEALTH together with its subsidiaries, provides integrated pharmacy health care services, operating through its Pharmacy Services and Retail/LTC segments.

130. As of December 31, 2017, CVS HEALTH had twenty-three retail specialty pharmacy stores, eighteen specialty mail order pharmacies and four mail order dispensing pharmacies, and eighty-three branches for infusion and enteral services. The Retail/LTC segment sells prescription drugs, over-the-counter drugs, beauty products and cosmetics, personal care products, convenience foods, seasonal merchandise, and greeting cards, as well as offers photo finishing services.



19 of 142

131. The Company has 9,803 retail stores in forty-nine states, the District of Columbia, Puerto Rico, and Brazil.

132. On May 20, 2015, CVS Pharmacy, Inc. ("CVS PHARMACY") is a wholly owned subsidiary of CVS HEALTH (collectively referred to as "CVS").

133. CVS distributes substantial amounts of prescription opioids to patients in the United States and New York.

134. The drugs distributed by CVS include powerful, addictive opioids, such as oxycodone and hydrocodone.

**ii. "DUANE READE"**

135. Defendant DUANE READE, INC. ("DRI") is a Delaware corporation doing business in the United States and New York State.

136. DRI maintains corporate headquarters at 440 Ninth Avenue, New York, NY 10001.

137. Duane Reade Holdings, Inc. ("DRH") is a Delaware corporation, doing business in the United States and New York State.

138. DRI and DRH operate a chain of approximately 258 retail drugstores throughout the New York City and the adjacent metropolitan area.

139. Walgreen Co. ("WALGREENS and collectively referred to with DRI and DRH as "DUANE READE") bought DRI an DRH in April 2010.

140. Upon information and belief DRI and DRH is now a fully owned subsidiary of WALGREENS.

141. WALGREENS maintains its corporate headquarters at 200 Wilmot Road, Deerfield, Illinois 60015.



20 of 142

142. DUANE READE, together with its subsidiaries, provides integrated pharmacy health care services, operating through its Pharmacy Services and Retail/LTC segments.

143. DUANE READE distributes substantial amounts of prescription opioids to patients in the United States and New York.

144. The drugs distributed by DUANE READE include powerful, addictive opioids, such as oxycodone and hydrocodone.

**iii. JOHN AND JANE DOE PHARMACIES 1 THROUGH 10**

145. JOHN AND JANE DOE PHARMACIES 1 THROUGH 10, are pharmacies that filled opioid prescriptions carelessly, unskillfully, in a grossly negligent manner, and not in accordance with accepted standards of medical care, diagnosis, treatment and services in the community; all whose true names are unknown,

## III. JURISDICTION AND VENUE

146. Jurisdiction is proper in this Court pursuant to Civil Practice Law and Rules (hereinafter "CPLR") § 302(a).

147. This Court has personal jurisdiction over DEFENDANTS because each has committed torts, in part or in whole, within the State of New York, as alleged herein.

148. This Court has personal jurisdiction over DEFENDANTS because each has conducted business within the State of New York, as alleged herein.

149. This Court has personal jurisdiction over each of the DEFENDANTS because Plaintiffs' claims arise out of, or relate to, each DEFENDANTS' contacts with New York. For example:

a. MANUFACTURING DEFENDANTS and DISTRIBUTING DEFENDANTS knowingly and intentionally, at all relevant times, sold, marketed, advertised,



21 of 142

promoted, and distributed their products in the State of New York and to New York residents, citizens, and businesses, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS, as well as to the State of New York;

b. DEFENDANTS enter into contracts relating to the subject-matter of this action in the State of New York;

c. DEFENDANTS have directed advertising, marketing, and promotional efforts at the State of New York and New York residents, citizens, and businesses, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS;

d. DEFENDANTS have engaged in advertising, marketing, and promotional activities with the intent and expectation that these activities would reach and affect the State of New York and/or New York residents, citizens, and businesses, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS;

e. PHARMACY DEFENDANTS, MANUFACTURING DEFENDANTS and DISTRIBUTING DEFENDANTS have delivered, distributed, dispensed, and sold opioids in New York with the intent and the expectation that those products would be distributed to or purchased by New York residents, citizens, and businesses, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS; and

f. As described herein, Plaintiff sues to vindicate injuries that have occurred within the State of New York.

150. All causes of action herein relate to DEFENDANTS' wrongful actions, conduct, and omission committed against Plaintiff, and the consequences and damages related to said wrongful actions, conduct, and omissions.



22 of 142

151. Venue is proper in this Court pursuant to CPLR § 503 in that at least one Plaintiffs resides in Richmond County.

## IV. FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

152. At all relevant times, the MANUFACTURING DEFENDANTS promoted, marketed, advertised, and sold prescription opioid medications to consumers, physicians, other prescribers, pharmacies and state governmental agencies within the state of New York.

153. At all relevant times, the DISTRIBUTING DEFENDANTS distributed prescription opioid medications to Pharmacies in New York.

154. At all relevant times, the PHYSICIAN DEFENDANTS wrote and provided prescription opioid medications to residents in New York, including DECEDENT ALIOTTA, with the state of New York.

155. At all relevant times, the PHARMACY DEFENDANTS sold prescription opioid medications from Pharmacies in New York at which consumers received and/or purchased same, including DECENDENT ALIOTTA.

156. That from on or about October of 2007 DECEDENT ALIOTTA was a patient of PHYSICIAN DEFENDANTS and in particular by SIUH.

157. At various times from October of 2007 until her death, the DECEDENT ALIOTTA was treated by PHSYICIAN DEFENDANTS, and in particular by SIUH, for Crohn's Disease and related pain.

158. During the aforesaid treatment, PHSYCIAN DEFENDANTS, and in particular SIUH, and/or their employees and/or agents and/or attending or treating doctors,



23 of 142

prescribed opioid based medications which were filled by one or more of the PHARMACY DEFENDANTS.

159. These opioid prescription medications included Vicodin, and upon information and belief other opioids manufactured by MANUFACTURING DEFENDANTS and distributed by DISTRIBUTING DEFENDANTS.

160. All of the DEFENDANTS in this action share responsibility for creating, sustaining, and prolonging the opioid epidemic and the death of DECEDENT ALIOTTA and members of PLAINTIFF CLASS.

161. The explosion in opioid prescriptions and use has created a public health crisis in New York.

162. An oversupply of prescription opioids has provided a source for illicit use or sale of opioids, while their widespread use has created a population of addicted and dependent patients.

163. And when those patients, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS, can no longer afford or legitimately obtain opioids, they often turn to the street to buy prescription opioids or even heroin.

164. This action seeks to hold DEFENDANTS accountable for creating an environment that directly caused DECEDENT ALIOTTA and members of PLAINTIFF CLASS' opioid addiction and related death.

165. The DEFENDANTS engaged in misconduct, including their knowing and reckless failure to prevent the rampant diversion of opioids.

**A. The MANUFACTURING DEFENDANTS Intentionally Misled Doctors and Consumers, including the DECEDENT ALIOTTA and PLAINTIFF CLASS, About the Risks and Benefits of Opioids to Generate Billions of Dollars in Improper Profits.**



24 of 142

166. To convince doctors and patients in New York that opioids can and should be used to treat chronic pain, the MANUFACTURING DEFENDANTS had to convince them that long-term opioid use is both safe and helpful.

167. They did so by deceiving those doctors and patients about the risks and benefits of long-term opioid use, making claims that were not supported by or were contrary to the scientific evidence.

168. Even though guidance from the FDA and the CDC based on that evidence confirm that their claims were false and misleading, the MANUFACTURING DEFENDANTS have not corrected them and continue to spread them today.

169. As such, the MANUFACTURING DEFENDANTS intentionally downplayed the risks of opioids marketing the drugs to the medical community as non-addicting, which resulted in healthcare providers prescribing them more aggressively.

170. As part of their marketing scheme, MANUFACTURING DEFENDANTS employed key physicians, identified as "key opinion leaders," to encourage opioid prescribing.

171. In short, the MANUFACTURING DEFENDANTS have engaged in a cunning and deceptive marketing scheme to encourage doctors and patients to use opioids to treat chronic pain.

172. In doing so, the MANUFACTURING DEFENDANTS falsely minimized the risks of opioids, overstated their benefits, and generated far more opioid prescriptions than there should have been.



25 of 142

173. The opioid epidemic, as well as DECEDENT ALIOTTA's death, is the direct result of the MANUFACTURING DEFENDANTS deliberately crafted, well-funded campaign of deception.

174. For years, the MANUFACTURING DEFENDANTS misrepresented the risks posed by the opioids they manufactured and sold misleading susceptible prescribers and vulnerable patient populations.

175. As families and communities suffered from the scourge of opioid abuse, the MANUFACTURING DEFENDANTS earned billions in profits as a direct result of the harms they inflicted.

176. The MANUFACTURING DEFENDANTS knew that their misrepresentations about the risks and benefits of opioids were not supported by, and sometimes were directly contrary to, the scientific evidence.

177. Certain opioid Manufacturers, including ENDO DEFENDANTS and PURDUE DEFENDANTS have entered agreements prohibiting them from making misrepresentations identified in this Complaint.

178. Nonetheless, the MANUFACTURING DEFENDANTS continue to misrepresent the risks and benefits of long-term opioid use in New York, and they have not corrected their past misrepresentations.

179. The MANUFACTURING DEFENDANTS' false and misleading statements deceived doctors and patients, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS, about the risks and benefits of opioids and convinced them that opioids were not only appropriate, but necessary to treat chronic pain.



26 of 142

180. The MANUFACTURING DEFENDANTS targeted susceptible prescribers, like family doctors, and vulnerable patient populations, which included DECEDENT ALIOTTA (a person suffering from Crohn's disease)and members of PLAINTIFF CLASS.

181. In addition, the MANUFACTURING DEFENDANTS, tainted sources that doctors and patients relied upon for guidance, including treatment guidelines, medical education programs, medical conferences and seminars, and scientific articles.

182. As a result, they successfully transformed the way doctors treat chronic pain, opening the floodgates of opioid prescriptions and dependence.

183. Opioids are now the most prescribed class of drugs, generating billions of dollars in revenue for the MANUFACTURING DEFENDANTS every year.

184. The MANUFACTURING DEFENDANTS employed a multi-pronged approach to misinform doctors and patients.

185. First, the MANUFACTURING DEFENDANTS communicated directly to doctors and chronic-pain patients.

186. For doctors, this took the form of in-person visits and communications from sales and promotional staff; continuing medical education programs; advertisements, including in periodicals aimed at medical audiences; websites; and other means.

187. For chronic-pain patients, this included websites; advertisements; publications aimed at the public; and other means.

188. For example, the MANUFACTURING DEFENDANTS spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they spent in



27 of 142

2001. This amount included $8.3 million by PURDUE DEFENDANTS, $4.9 million by JANSSEN, and $1.1 million by ENDO DEFENDANTS.

189. In addition, the MANUFACTURING DEFENDANTS promoted the use of opioids for chronic pain through “detailers”; sales representatives who visited individual doctors and medical staff in their offices, and small group speaker programs.

190. For example, in New York, over a six-year period alone, PURDUE DEFENDANTS made more than 1,800 sales visits to doctors it had flagged on a “no call” list.

191. Similarly, ENDO DEFENDANTS made 326 detailing visits to certain New York prescribers who were subsequently arrested and/or convicted for illegally prescribing opioids.

192. Said detailers have spread and continue to spread misinformation regarding the risks and benefits of opioids to hundreds of thousands of doctors, including thousands of New York doctors.

193. Not until February 2018 did PURDUE DEFENDANTS announce that it would cease the practice of sending its salespeople to visit doctors to promote its opioid drugs.

194. The MANUFACTURING DEFENDANTS devoted and continue to devote massive resources to direct sales contacts with doctors.

195. For example, in 2014 the MANUFACTURING DEFENDANTS spent $168 million on detailers to push branded opioids to doctors: twice as much as they spent on detailing in 2000.



28 of 142

196. Said amount includes $108 million spent by PURDUE DEFENDANTS, $34 million by JANSSEN, $10 million by ENDO DEFENDANTS, and $2 million by ACTAVIS.

197. The MANUFACTURING DEFENDANTS detailing to doctors is extremely effective as supported by numerous studies that indicate that this type of marketing impacts prescribing habits.

198. Moreover, more frequent prescribers of opioids in New York were generally more likely to have received a detailing visit, as they were perceived by the MANUFACTURING DEFENDANTS as quality customers willing to push their opioid drugs.

199. The MANUFACTURING DEFENDANTS' detailers have been reprimanded for their deceptive promotions.

200. For example, a July 2010 "Dear Doctor" letter mandated by the FDA required ACTAVIS to acknowledge to the doctors to whom it marketed its drugs that "[b]etween June 2009 and February 2010, Actavis sales representatives distributed . . . promotional materials that . . . omitted and minimized serious risks associated with [Kadian]," including the risk of "[m]isuse, [a]buse, and [d]iversion of [o]pioids" and, specifically, the risk that "[o]pioid[s] have the potential for being abused and are sought by drug abusers and people with addiction disorders and are subject to criminal diversion."

201. Second, the MANUFACTURING DEFENDANTS created, funded, controlled, and operated third-party organizations that communicated directly with doctors and chronic-pain patients to promote opioid use generally without naming specific brands.



29 of 142

202. The MANUFACTURING DEFENDANTS marketed through third-party, unbranded advertising to avoid regulatory scrutiny because such advertising is not submitted to and typically is not reviewed by the FDA.

203. They also used third-party, unbranded advertising to give the false appearance that the deceptive messages came from an independent and objective source.

204. The MANUFACTURING DEFENDANTS' deceptive, unbranded marketing often contradicted what they said in their branded materials reviewed by the FDA.

205. For example, ENDO DEFENDANTS' unbranded advertising stated that "people who take opioids as prescribed usually do not become addicted," which contradicted its concurrent, branded advertising for Opana ER, which warned that "use of opioid analgesic products carries the risk of addiction even under appropriate medical use."

206. Under the direction and control of the MANUFACTURING DEFENDANTS, these third-party organizations, or "Front Groups," which include the American Pain Foundation (hereinafter referred to as "APF") and the American Academy of Pain Medicine (hereinafter referred to as "AAPM"), generated treatment guidelines, unbranded materials, and programs that endorsed chronic opioid therapy.

207. These guidelines, materials, and programs were not supported by the evidence at the time they were created, nor are they supported by the scientific evidence today.

208. Indeed, they stand in marked contrast to the CDC's 2016 Guideline for Prescribing Opioids for Chronic Pain ("2016 CDC Guideline").

209. These Front Groups also assisted the MANUFACTURING DEFENDANTS by responding to negative articles, advocating against regulatory changes that would limit



30 of 142

opioid prescriptions, and conducting outreach to vulnerable patient populations targeted by the MANUFACTURING DEFENDANTS.

210. These Front Groups depended on the MANUFACTURING DEFENDANTS for funding.

211. As a result, the MANUFACTURING DEFENDANTS exercised control over programs and materials created by these Front Groups by collaborating on, editing, and approving their content, and by funding their dissemination.

212. PURDUE DEFENDANTS' consulting agreement with APF, for example, gave it direct control over APF's work.

213. The MANUFACTURING DEFENDANTS thus ensured that the Front Groups would disseminate only the messages that the MANUFACTURING DEFENDANTS wanted to promote.

214. Nonetheless, the Front Groups held themselves out as independent and serving the needs of their members: whether patients suffering from pain, or the doctors treating those patients.

215. Through the Front Groups, the MANUFACTURING DEFENDANTS conspired to spread their deceptive messages about the risks and benefits of long-term opioid therapy.

216. For example, DEFENDANTS combined their efforts through the Pain Care Forum ("PCF"), which APF started in 2004.

217. PCF is composed of representatives from opioid Manufacturers (including ENDO DEFENDANTS, JOHNSON DEFENDANTS, and PURDUE DEFENDANTS) and



31 of 142

various Front Groups, almost all of which received substantial funding from the MANUFACTURING DEFENDANTS.

218. Among other projects, PCF worked to ensure that an FDA-mandated education project on opioids was not too negative and did not require mandatory participation by prescribers, which the MANUFACTURING DEFENDANTS feared would reduce prescriptions.

219. PCF also worked to address a perceived "lack of coordination" among its members and developed "key" messages that were disseminated in programs and industry-run websites.

220. At all relevant times, the MANUFACTURING DEFENDANTS controlled, operated, funded, and acted in concert with APF, AAPM, and other Front Groups.

221. The MANUFACTURING DEFENDANTS provided substantial funding for these organizations' activities.

222. In 2010 alone, APF received more than $1 million from Defendant ENDO DEFENDANTS, more than $100,000 from Defendant PURDUE DEFENDANTS, as well as substantial contributions from Defendant JANSSEN.

223. At all relevant times, the MANUFACTURING DEFENDANTS were legally responsible for the acts, omissions, and representations of APF and AAPM; APF and AAPM acted as agents for DEFENDANTS; and DEFENDANTS conspired with APF, AAPM, and other third-party entities with respect to the conduct described herein.

224. Third, the MANUFACTURING DEFENDANTS enlisted highly credentialed medical professionals to spread their false narratives about the risks and benefits of opioids and other pain-treatment options.



32 of 142

225. These medical professionals engaged by the MANUFACTURING DEFENDANTS have been referred to as "key opinion leaders" or "KOLs," who include individuals such as Dr. Russell Portenoy and Dr. Lynn Webster.

226. Because these KOLs purported to act independently, the purpose and effect of their involvement was to lend legitimacy to the MANUFACTURING DEFENDANTS' false and misleading claims about opioids.

227. The MANUFACTURING DEFENDANTS paid these KOLs to serve as consultants or on their advisory boards and to give talks or to present continuing medical education programs (hereinafter referred to as "CMEs"), and their support helped these KOLs become respected industry experts.

228. As they rose to prominence, these KOLs touted the benefits of opioids to treat chronic pain, repaying the MANUFACTURING DEFENDANTS by advancing their marketing goals.

229. KOLs' professional reputations became dependent on continuing to promote a pro-opioid message, even in activities that were not directly funded by the MANUFACTURING DEFENDANTS.

230. Pro-opioid doctors are one of the most important avenues that the MANUFACTURING DEFENDANTS have used to spread their false and misleading statements about the risks and benefits of long-term opioid use.

231. The MANUFACTURING DEFENDANTS know that doctors rely heavily on their peers for guidance, and KOLs provide the false appearance of unbiased and reliable support for chronic opioid therapy.



33 of 142

232. For example, the New York Attorney General ("NY AG") found in its 2015 settlement with PURDUE DEFENDANTS that, through March 2015, the PURDUE DEFENDANTS website In the Face of Pain failed to disclose that doctors who provided testimonials on the site were paid by PURDUE DEFENDANTS.

233. The New York Attorney General concluded that the PURDUE DEFENDANTS failure to disclose these financial connections potentially misled consumers regarding the objectivity of the testimonials.

234. KOLs have written, consulted on, edited, and lent their names to books and articles, and given speeches and CMEs, supportive of chronic opioid therapy.

235. The MANUFACTURING DEFENDANTS created opportunities for KOLs to participate in research studies that the MANUFACTURING DEFENDANTS proposed or selected, and then cited and promoted favorable studies or articles by their KOLs.

236. The MANUFACTURING DEFENDANTS did not support or disseminate publications of doctors unsupportive or critical of chronic opioid therapy, including if, by a miracle a KOL had an opinion differing from the stance supported by the MANUFACTURING DEFENDANTS.

237. The KOLs also served on committees that developed treatment guidelines that strongly encourage the use of opioids to treat chronic pain and on the boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs.

238. These guidelines and CMEs were not supported by the scientific evidence at the time they were created, and they are not supported by the scientific evidence today.



34 of 142

239. The 2016 CDC Guideline recognizes that treatment guidelines can "change prescribing practices."

240. At all relevant times, the MANUFACTURING DEFENDANTS controlled, funded, and acted in concert with these KOLs; they were legally responsible for the acts, omissions, and representations of these KOLs, who acted as their agents; and the MANUFACTURING DEFENDANTS conspired with these KOLs regarding the conduct described herein.

241. Through all three of these avenues, the MANUFACTURING DEFENDANTS disseminated false and deceptive statements about opioids.

242. As explained above, for decades doctors had viewed opioids with suspicion, judging that the risk of addiction made such drugs inappropriate in all but a small number of situations.

**B. The MANUFACTURING DEFENDANTS Misrepresented the Known Risks of Long-Term Opioid Use.**

243. The MANUFACTURING DEFENDANTS deceptively trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked and rejected by the FDA and CDC.

244. Specifically, they made false, misleading, and fraudulent representations to both physicians and consumers, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS that:

a. starting patients on opioids was low-risk because most patients would not become addicted and those who were at greatest risk of addiction could be readily identified and managed;



35 of 142

b. patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs;

c. the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, does not pose special risks; and,

d. abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive.

245. The MANUFACTURING DEFENDANTS have not only failed to correct these misrepresentations, they continue to make them today.

**C. The MANUFACTURING DEFENDANTS Misrepresented that Opioids Posed a Low Risk of Addiction.**

246. The MANUFACTURING DEFENDANTS falsely represented that opioids pose a low risk of addiction.

247. The MANUFACTURING DEFENDANTS falsely minimized the risk of addiction and failed to disclose the greater risk of addiction with prolonged use of opioids. Some illustrative examples of these false and misleading claims are described below:

a. Actavis's predecessor caused a patient education brochure to be distributed in 2007 that claimed opioid addiction is possible, but "less likely if you have never had an addiction problem." Upon information and belief, based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, Actavis continued to use this brochure in 2009 and beyond.

b. PURDUE DEFENDANTS and CEPHALON DEFENDANTS sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which instructed that addiction is rare and limited to extreme cases of unauthorized dose



36 of 142

escalations, obtaining duplicative opioid prescriptions from multiple sources, or theft. This publication is still available online.

c. ENDO DEFENDANTS sponsored a website, Painknowledge.com, which claimed in 2009 that "[p]eople who take opioids as prescribed usually do not become addicted." Another ENDO DEFENDANTS website, PainAction.com, stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them."

d. ENDO DEFENDANTS distributed a pamphlet with the ENDO DEFENDANTS logo entitled Living with Someone with Chronic Pain, which stated that: "Most health care providers who treat people with pain agree that most people do not develop an addiction problem." A similar statement appeared on the ENDO DEFENDANTS website www.opana.com.

e. In another publication, ENDO DEFENDANTS represented that "[i]n general, people who have no history of drug abuse, including tobacco, and use their opioid medication as directed will probably not become addicted."

f. JOHNSON DEFENDANTS reviewed, edited, approved, and distributed a patient education guide entitled Finding Relief: Pain Management for Older Adults (2009), which described as "myth" the claim that opioids are addictive, and asserted as fact that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain." This guide is still available online.

g. JOHNSON DEFENDANTS developed and published a website, Prescriberesponsibly.com which claimed that concerns about opioid addiction are



37 of 142

"overestimated" and that that opioid addiction is unlikely unless the patient is recovering from past drug or alcohol abuse.

h. PURDUE DEFENDANTS sponsored APF's A Policymaker's Guide to Understanding Pain & Its Management, which claims that less than 1% of children prescribed opioids will become addicted and that pain is undertreated due to "misconceptions about opioid addiction."

i. In the APF publication Getting the Help You Need, the MANUFACTURING DEFENDANTS represented that "[s]tudies and clinical practice have shown that the risk of addiction is small when [opioids] are appropriately prescribed and taken as directed."

j. In the same APF publication, the MANUFACTURING DEFENDANTS represented that "[u]nless you have a past or current history of substance abuse, the chance of addiction is low when these medications are prescribed properly and taken as directed."

k. The same APF publication also stated: "Keep in mind, pain medicine in and of itself does not cause someone to become addicted."

l. In a "Commonly Asked Questions and Answers" portion of the APF website, DEFENDANTS represented that "addiction is very rare when pain medicines are properly prescribed and taken as directed."

m. CEPHALON sponsored a guidebook called Opioid Medications and REMS: A Patient's Guide, which falsely represented that "patients without a history of abuse or a family history of abuse do not commonly become addicted to opioids."



38 of 142

n. APF's Executive Director represented that "when taken as prescribed, under the direction of a physician for pain relief, opioids are safe and effective, and only in rare cases lead to addiction." He further represented that "less than 1% of patients become addicted" to opioids.

248. The representations identified above, and other similar representations by the MANUFACTURING DEFENDANTS, and others, regarding the safety of opioid medications were and are false.

249. Extensive medical research demonstrates that opioids pose a substantial risk of addiction, abuse, and overdose.

250. In particular, opioids pose a substantial risk of addiction when they are used for extended periods of time, such as for treatment of chronic pain, and when they are administered outside the close supervision of medical professionals.

251. Many studies have shown substantial risk of addiction where patients take opioids to treat chronic non-cancer pain.

252. Many patients, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS, become addicted to opioids even when they originally take opioids pursuant to a valid prescription.

253. Indeed, one study found that 75% of those addicted to opioids, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS, first took them pursuant to a prescription.

254. Research suggests that the overdose-death rate for those taking opioids pursuant to a prescription is higher than the rate for those using opioids non-medically.



39 of 142

255. One study examining opioid overdose deaths found that "92% of the decedents had been receiving [putatively] legitimate [opioid] prescriptions from health care providers for chronic pain."

256. Many patients, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS, become addicted to opioids even though they have no prior history of addiction or substance abuse.

257. Indeed, the 2016 CDC Guideline found that there is "extensive evidence" of the "possible harms of opioids (including opioid use disorder [an alternative term for opioid addiction])."

258. The Guideline points out that "[o]pioid pain medication use presents serious risks, including . . . opioid use disorder" and that "continuing opioid therapy for 3 months substantially increases risk for opioid use disorder."

259. The FDA's announcement of changes to the labels for extended release ("ER") and long acting ("LA") opioids in 2013 and for immediate release ("IR") opioids in 2016 further exposed the falsity of the MANUFACTURING DEFENDANTS' claims about the low risk of addiction.

260. In its announcements, the FDA found that "most opioid drugs have 'high potential for abuse'" and that opioids "are associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death."

261. According to the FDA, because of the "known serious risks" associated with long-term opioid use, including "risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and death," opioids



40 of 142

should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed.

262. The FDA further acknowledged that the risk is not limited to patients who seek drugs illicitly; addiction "can occur in patients appropriately prescribed" opioids.

263. The MANUFACTURING DEFENDANTS' own FDA-approved drug label warnings caution that opioids "expose[] users to risks of addiction, abuse and misuse, which can lead to overdose and death," that the drugs contain "a substance with a high potential for abuse," and that addiction "can occur in patients appropriately prescribed" opioids.

264. In a 2016 settlement agreement with ENDO DEFENDANTS, the New York Attorney General found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder."

265. Until at least April 2012, ENDO DEFENDANTS had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but the NY AG found that ENDO DEFENDANTS had no evidence for that statement.

266. Consistent with this, ENDO DEFENDANTS agreed not to "make statements that . . . opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York.



41 of 142

267. Doctors, consumers, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS, reasonably relied on these misrepresentations.

268. As a result, many doctors prescribed opioids when they otherwise would not have, and many patients, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS obtained opioids when they otherwise would not have.

269. The MANUFACTURING DEFENDANTS knew that their representations described herein were false, and they made those representations with intent to defraud.

**D. The MANUFACTURING DEFENDANTS Purposefully and Fraudulently Created the Idea of "Pseudoaddiction".**

270. The MANUFACTURING DEFENDANTS repeatedly misrepresented to doctors, and consumers, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS, that many individuals exhibiting signs of addiction were experiencing "pseudoaddiction"—a concept originally put forward by J. David Haddox, who later became a Vice President for Defendant PURDUE DEFENDANTS, and popularized by Dr. Russell Portenoy, a KOL for ENDO DEFENDANTS, JANSSEN, CEPHALON, and PURDUE DEFENDANTS.

271. MANUFACTURING DEFENDANTS further falsely represented that the proper treatment for "pseudoaddiction" is more opioids.

272. Examples of these deceptive claims include the following:

a. PURDUE DEFENDANTS and TEVA DEFENDANTS sponsored Responsible Opioid Prescribing (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudoaddiction, rather than true addiction. Responsible Opioid Prescribing remains for sale online.



42 of 142

b. JOHNSON DEFENDANTS sponsored, funded, and edited the Let's Talk Pain website, which in 2009 stated: "pseudoaddiction . . . refers to patient behaviors that may occur when pain is under-treated Pseudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management." This website was accessible online until May 2012.

c. ENDO DEFENDANTS sponsored a National Initiative on Pain Control (NIPC) CME program in 2009 entitled Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia, which promoted pseudoaddiction by teaching that a patient's aberrant behavior was the result of untreated pain. ENDO DEFENDANTS substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing content; and distributing NIPC materials.

d. ENDO DEFENDANTS also represented that "[s]ometimes people behave as if they are addicted, when they are really in need of more medicine. This can be treated with higher doses of medicine."

e. PURDUE DEFENDANTS published a pamphlet in 2011 entitled Providing Relief, Preventing Abuse, which described pseudoaddiction as a concept that "emerged in the literature" to describe the inaccurate interpretation of [drug-seeking behaviors] in patients who have pain that has not been effectively treated."

f. PURDUE DEFENDANTS sponsored a CME program entitled Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse in 2011. In a role play, a chronic pain patient with a history of drug abuse tells his doctor that he is taking twice as many hydrocodone pills as directed. The narrator notes that



43 of 142

because of pseudoaddiction, the doctor should not assume the patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine, or "overindulges in unapproved escalating doses." The doctor treats this patient by prescribing a high-dose, long- acting opioid.

g. Detailers for PURDUE DEFENDANTS have directed doctors and their medical staffs to PartnersAgainstPain.com, which contained false and misleading materials describing pseudoaddiction.

h. PURDUE DEFENDANTS and TEVA DEFENDANTS sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which states: "Pseudo-addiction describes patient behaviors that may occur when pain is undertreated    Pseudo-addiction can be distinguished from true addiction in that this behavior ceases when pain is effectively treated."

273. These representations, and others, including those regarding the safety of opioid medications were and are false.

274. Conversely to the MANUFACTURER DEFENDANTS' statements significant medical literature casts doubt on the concept of "pseudoaddiction."

275. For example, one medical study reviewed all academic medical publications discussing "pseudoaddiction" and concluded that, "[o]f the 224 articles, none exist that attempted to empirically validate the concept of pseudoaddiction."

276. The same study found that many of the articles that considered "pseudoaddiction as a genuine clinical phenomenon" were funded by opioid producers, including JOHNSON DEFENDANTS and PURDUE DEFENDANTS.



44 of 142

277. In addition, the CDC's opioid-prescribing guidelines do not recognize "pseudoaddiction" as a legitimate medical concept and nowhere recommends that opioid dosages be increased if a patient is not experiencing pain relief.

278. As Dr. Lynn Webster later recognized, the concept of pseudoaddiction "obviously became too much of an excuse to give patients more medication…[and] it led us down a path that caused harm. It is already something we are debunking as a concept."

279. ENDO DEFENDANTS have effectively repudiated the concept of pseudoaddiction.

280. In finding that "[t]he pseudoaddiction concept has never been empirically validated and in fact has been abandoned by some of its proponents," the NY AG, in its 2016 settlement with ENDO DEFENDANTS, reported that "ENDO DEFENDANTS' Vice President for Pharmacovigilance and Risk Management testified to [the NY AG] that he was not aware of any research validating the 'pseudoaddiction' concept" and acknowledged the difficulty in distinguishing "between addiction and 'pseudoaddiction.'"

281. ENDO DEFENDANTS agreed not to "use the term 'pseudoaddiction' in any training or marketing" in New York.

282. Doctors and consumers, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS, reasonably relied on the MANUFACTURING DEFENDANTS' misrepresentations.

283. As a result of that reasonable reliance, many doctors prescribed opioids when they otherwise would not have, and many patients obtained, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS, opioids when they otherwise would not



45 of 142

have. Insurers kept MANUFACTURING DEFENDANTS' opioids in their formularies and paid more than they were worth.

284. In particular, the false representations induced many doctors to increase opioid dosage based on the belief that patients' signs of addiction actually reflected "pseudoaddiction."

285. In addition, the MANUFACTURING DEFENDANTS' false representations induced many doctors to continue prescribing opioids to patients exhibiting signs of addiction even though those doctors should have discontinued the prescriptions.

286. The MANUFACTURING DEFENDANTS knew that their representations described herein were false and made those representations with intent to defraud.

287. The MANUFACTURING DEFENDANTS intentionally made their representations described herein to New York citizens, residents, and businesses, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS.

**E. The MANUFACTURING DEFENDANTS Misrepresented the Signs of Addiction and the Ease of Preventing Addiction.**

288. The MANUFACTURING DEFENDANTS misrepresented the signs of addiction and the ease of preventing addiction.

289. Third, the MANUFACTURING DEFENDANTS repeatedly misrepresented the signs of addiction, the appropriate medical response to evidence of patient addiction or dependence, and the ease of preventing addiction.

290. Specifically, they falsely instructed insurers, doctors, and patients that addiction risk screening tools, patient contracts, urine drug screens, and similar strategies allow them reliably to identify and safely to prescribe opioids to patients predisposed to addiction.



46 of 142

291. The MANUFACTURING DEFENDANTS targeted these misrepresentations at general practitioners and family doctors who often lack the time and expertise to closely manage higher-risk patients on opioids.

292. These misrepresentations made these doctors feel more comfortable prescribing opioids to their patients, made patients more comfortable starting on opioid therapy for chronic pain, and induced insurers to not question this practice.

293. Examples of these deceptive claims include the following:

a. ENDO DEFENDANTS represented that "[t]aking opioids for pain relief is not addiction" and that "[a]ddiction to an opioid would mean that your pain has gone away but you still take the medicine regularly when you don't need it for pain, maybe just to escape from your problem."

b. In the same publication, ENDO DEFENDANTS suggested that patients use the following test to determine whether they are addicted to opioids: "Ask yourself: Would I want to take this medicine if my pain went away? If your answer no, you are taking opioids for the right reasons—to relieve pain and improve your function. You are not addicted."

c. ENDO DEFENDANTS paid for a 2007 supplement in the Journal of Family Practice written by a doctor who became a member of ENDO DEFENDANTS' speakers bureau in 2010. The supplement, entitled Pain Management Dilemmas in Primary Care: Use of Opioids, emphasized the effectiveness of screening tools, claiming that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts.



47 of 142

d. PURDUE DEFENDANTS sponsored a November 2011 webinar, Managing Patient's Opioid Use: Balancing the Need and Risk, which claimed that screening tools, urine tests, and patient agreements prevent "overuse of prescriptions" and "overdose deaths."

e. As recently as 2015, PURDUE DEFENDANTS has represented in scientific conferences that "bad apple" patients—and not opioids—are the source of the addiction crisis and that once those "bad apples" are identified, doctors can safely prescribe opioids without causing addiction.

f. Detailers for PURDUE DEFENDANTS have touted and continue to tout to doctors the reliability and effectiveness of screening or monitoring patients as a tool for managing opioid abuse and addiction.

294. The representations identified above, and other similar representations by the MANUFACTURING DEFENDANTS, and others, including those regarding the safety of opioid medications were and are false.

295. Moreover, the 2016 CDC Guideline confirms that these statements were false, misleading, and unsupported at the time they were made.

296. The Guideline notes that there are no studies assessing the effectiveness of risk mitigation strategies—such as screening tools, patient contracts, urine drug testing, or pill counts widely believed by doctors to detect and deter abuse—"for improving outcomes related to overdose, addiction, abuse, or misuse."

297. As a result, the Guideline recognizes that available risk screening tools "show insufficient accuracy for classification of patients as at low or high risk for [opioid] abuse



48 of 142

or misuse" and counsels that doctors "should not overestimate the ability of these tools to rule out risks from long-term opioid therapy."

298. The MANUFACTURING DEFENDANTS intentionally made the representations described herein to New York citizens, residents, and businesses, including to DECEDENT ALIOTTA and the members of the PLAINTIFF CLASS.

**F. The MANUFACTURING DEFENDANTS Falsely Claimed that Opioid Dependence can Easily by Addressed by Tapering and that Opioid Withdrawal is not a Problem.**

299. The MANUFACTURING DEFENDANTS falsely claimed that opioid dependence can easily be addressed by tapering and that opioid withdrawal is not a problem.

300. For example, a 2011 non-credit educational program sponsored by ENDO DEFENDANTS, entitled Persistent Pain in the Older Adult, claimed that withdrawal symptoms can be avoided by tapering a patient's opioid dose by 10%-20% for 10 days.

301. PURDUE DEFENDANTS sponsored APF's A Policymaker's Guide to Understanding Pain & Its Management, which claimed that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation" without mentioning any hardships that might occur. This publication was available on APF's website until the organization dissolved in May 2012.

302. JOHNSON DEFENDANTS minimized the risk of addiction by telling doctors that their patients would not experience withdrawal if they tried to stop using opioids.

303. The MANUFACTURING DEFENDANTS deceptively minimized the significant symptoms of opioid withdrawal, which, as explained in the 2016 CDC Guideline, include drug craving, anxiety, insomnia, abdominal pain, vomiting, diarrhea, sweating, tremor, tachycardia (rapid heartbeat), spontaneous abortion and premature labor in pregnant



49 of 142

women, and the unmasking of anxiety, depression, and addiction, and grossly understated the difficulty of tapering, particularly after long-term opioid use.

304. In fact, as the 2016 CDC Guideline recognizes, the duration of opioid use and the dosage of opioids prescribed should be “limit[ed]” to “minimize the need to taper opioids to prevent distressing or unpleasant withdrawal symptoms,” because “physical dependence on opioids is an expected physiologic response in patients exposed to opioids for more than a few days.”

305. Moreover, “tapering opioids can be especially challenging after years on high dosages because of physical and psychological dependence” and there are difficulties associated with tapering, including the need to carefully identify “a taper slow enough to minimize symptoms and signs of opioid withdrawal” and to “pause[] and restart[]” tapers depending on the patient’s response.

306. Despite this The MANUFACTURING DEFENDANTS failed to disclose the increased difficulty of stopping opioids after long-term use.

307. The CDC also acknowledges the lack of any “high-quality studies comparing the effectiveness of different tapering protocols for use when opioid dosage is reduced, or opioids are discontinued.”

**G. The MANUFACTURING DEFENDANTS Falsely Claimed that Opioid Dosages Could be Indefinitely Increased without Adverse Effect.**

308. The MANUFACTURING DEFENDANTS falsely claimed that doctors and patients could increase opioid dosages indefinitely without added risk.

309. The MANUFACTURING DEFENDANTS also failed to disclose the greater risks at higher dosages.



50 of 142

310. Said failure was primarily due to the fact that the ability to escalate dosages was critical to the MANUFACTURING DEFENDANTS' efforts to market and sell opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages ceased to provide pain relief.

311. Examples of these deceptive claims include the following:

a. Actavis's predecessor created a patient brochure for Kadian in 2007 that stated, "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction." Upon information and belief, based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, Actavis continued to use these materials in 2009 and beyond.

b. PURDUE DEFENDANTS and CEPHALON sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which claims that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed. The guide stated that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. This guide is still available for sale online.

c. ENDO DEFENDANTS sponsored a website, painknowledge.com, which claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain."

d. ENDO DEFENDANTS distributed a pamphlet edited by a KOL entitled Understanding Your Pain: Taking Oral Opioid Analgesics. In Q&A format, it



51 of 142

asked "If I take the opioid now, will it work later when I really need it?" The response is, "The dose can be increased…You won't 'run out' of pain relief."

e. JANSSEN sponsored a patient education guide entitled Finding Relief: Pain Management for Older Adults (2009), which was distributed by its sales force. This guide listed dosage limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased opioid dosages.

f. Through March 2015, PURDUE DEFENDANTS' In the Face of Pain website promoted the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will.

g. PURDUE DEFENDANTS sponsored APF's A Policymaker's Guide to Understanding Pain & Its Management, which taught that dosage escalations are "sometimes necessary," even unlimited ones, but did not disclose the risks from high opioid dosages. This publication is still available online.

h. PURDUE DEFENDANTS sponsored a CME entitled Overview of Management Options that is still available for CME credit. The CME was edited by a KOL and taught that non- steroidal anti-inflammatory drugs ("NSAIDs") and other drugs, but not opioids, are unsafe at high dosages.

i. PURDUE DEFENDANTS presented a 2015 paper at the College on the Problems of Drug Dependence challenging the correlation between opioid dosage and overdose.

312. These claims conflict with the scientific evidence, as confirmed by the FDA and CDC.



52 of 142

313. The 2016 CDC Guideline states that the "[b]enefits of high-dose opioids for chronic pain are not established" while the "risks for serious harms related to opioid therapy increase at higher opioid dosage."

314. More specifically, the CDC explains that "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages."

315. The CDC also states that "there is an increased risk for opioid use disorder, respiratory depression, and death at higher dosages."

316. That is why the CDC advises doctors to "avoid increasing dosages" above 90 morphine milligram equivalents per day.

317. The 2016 CDC Guideline reinforces earlier findings announced by the FDA.

318. In 2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events."

319. For example, the FDA noted that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality."

**H. The MANUFACTURING DEFENDANTS Falsely Claimed Abuse Deterrent Formulations were Safer than Traditional Opioids.**

320. The MANUFACTURING DEFENDANTS also falsely claimed that the abuse-deterrent properties of some of their opioids can prevent and curb addiction and abuse.

321. As a result, in a 2014 survey of 1,000 primary care physicians, nearly half reported that they believed abuse-deterrent formulations are inherently less addictive.



53 of 142

322. These abuse-deterrent formulations ("AD" opioids) are harder to crush, chew, or grind; become gelatinous when combined with a liquid, making them harder to inject; or contain a counteragent such as naloxone that is activated if the tablets are tampered with.

323. Despite this, AD opioids are not "impossible to abuse." They can be defeated, often quickly and easily.

324. Moreover, they do not stop oral intake, the most common method of opioid misuse and abuse, and they do not reduce the rate of misuse and abuse by patients who become addicted after using opioids long-term as prescribed or who escalate their use by taking more pills or higher doses.

325. As a result of these limitations on AD opioids and the heightened risk of misconceptions and the false belief that AD opioids can be prescribed safely, the FDA has cautioned that "[a]ny communications from the sponsor companies regarding AD properties must be truthful and not misleading (based on a product's labeling), and supported by sound science taking into consideration the totality of the data for the particular drug. Claims for AD opioid products that are false, misleading, and/or insufficiently proven do not serve the public health."

326. Despite this admonition, the MANUFACTURING DEFENDANTS have made and continue to make misleading claims about the ability of their so-called abuse-deterrent opioid formulations to prevent or reduce abuse and addiction and the safety of these formulations.

327. For example, ENDO DEFENDANTS have marketed Opana ER as tamper or crush resistant and less prone to misuse and abuse even though: (1) the FDA rejected ENDO DEFENDANTS petition to approve Opana ER as abuse-deterrent in 2012; (2) the



54 of 142

FDA warned in a 2013 letter that there was no evidence that Opana ER “would provide a reduction in oral, intranasal or intravenous abuse”; and (3) ENDO DEFENDANTS’ own studies, which it failed to disclose, showed that Opana ER could still be ground and chewed.

328. ENDO DEFENDANTS advertisements for the 2012 reformulation of Opana ER misleadingly claimed that it was designed to be crush resistant, suggesting it was more difficult to abuse.

329. And since 2012, detailers for ENDO DEFENDANTS have informed doctors that Opana ER is harder to abuse.

330. In fact, according to nurse practitioners the ENDO DEFENDANTS sent tamper and crush-resistant messages regarding Opana ER.

331. In addition, according to nurse practitioners ENDO DEFENDANTS also demonstrated the “abuse-deterrent properties” of Opana ER.

332. In its 2016 settlement with the NY AG, ENDO DEFENDANTS agreed not to make statements in New York that Opana ER was “designed to be or is crush resistant.”

333. The NY AG found those statements false and misleading because there was no difference in the ability to extract the narcotic from Opana ER.

334. The NY AG also found that ENDO DEFENDANTS failed to disclose its own knowledge of the crushability of redesigned Opana ER in its marketing to formulary committees and pharmacy benefit managers.

335. Because Opana ER could be “readily prepared for injection” and was linked to outbreaks of HIV and a serious blood disease, in May 2017, an FDA advisory committee recommended that Opana ER be withdrawn from the market.



55 of 142

336. The FDA adopted this recommendation on June 8, 2017 and requested that ENDO DEFENDANTS withdraw Opana ER from the market.

337. Likewise, PURDUE DEFENDANTS engaged and continue to engage in deceptive marketing of its AD opioid (i.e., reformulated OxyContin and Hysingla).

338. Before April 2013, PURDUE DEFENDANTS did not market its opioids based on their abuse-deterrent properties.

339. However, prescribers report that, beginning in 2013, detailers from PURDUE DEFENDANTS regularly touted the so-called abuse-deterrent properties of PURDUE DEFENDANTS' opioid products as a selling point to differentiate those products from their competitors.

340. Specifically, these detailers: (1) claim that PURDUE DEFENDANTS' AD opioids prevent tampering and cannot be crushed or snorted; (2) claim that PURDUE DEFENDANTS' AD opioids prevent or reduce opioid misuse, abuse, and diversion; are less likely to yield a euphoric high; and are disfavored by opioid abusers; (3) claim that PURDUE DEFENDANTS' AD opioids are "safer" than other opioids; and (4) fail to disclose that PURDUE DEFENDANTS' AD opioids do not impact oral misuse and that its abuse-deterrent properties can be defeated.

341. These statements and omissions by PURDUE DEFENDANTS are false and misleading and conflict with or are inconsistent with the FDA-approved label for PURDUE DEFENDANTS' AD opioids - which indicates that abusers do seek them because they can be snorted, that their abuse-deterrent properties can be defeated, and that they can be abused orally notwithstanding their abuse-deterrent properties.



56 of 142

342. Testimony in litigation against PURDUE DEFENDANTS and other evidence indicates that PURDUE DEFENDANTS knew and should have known that "reformulated OxyContin is not better at tamper resistance than the original OxyContin" and is still regularly tampered with and abused.

343. Websites and message boards used by drug abusers, such as bluelight.org and Reddit, also report a variety of ways to tamper with OxyContin and Hysingla, including through grinding, microwaving then freezing, or drinking soda or fruit juice in which the tablet has been dissolved.

344. Even PURDUE DEFENDANTS' own website describes a study it conducted that found continued abuse of OxyContin with so called abuse-deterrent properties.

345. Finally, there are no studies indicating that PURDUE DEFENDANTS' AD opioids are safer than any other opioid products.

346. A 2015 study also demonstrated that many opioid addicts were abusing PURDUE DEFENDANTS' AD opioids through oral intake or by defeating the abuse-deterrent mechanism.

347. Indeed, one-third of the patients in the study defeated the abuse-deterrent mechanism and were able to continue inhaling or injecting the drug.

348. And to the extent that the abuse of PURDUE DEFENDANTS' AD opioids was reduced; those addicts simply shifted to other drugs such as heroin.

349. In spite of all this, J. David Haddox, the Vice President of Health Policy for PURDUE DEFENDANTS, falsely claimed in 2016 that the evidence does not show that PURDUE DEFENDANTS' AD opioids are being abused in large numbers.



57 of 142

350. The 2016 CDC Guideline states that "[n]o studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse," noting that the technologies "do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by nonoral routes."

351. Tom Frieden, the Director of the CDC, has further reported that his staff could not find "any evidence showing the updated opioids [abuse deterrents] actually reduce rates of addiction, overdoses, or death."

352. These false and misleading claims about the abuse-deterrent properties of the MANUFACTURING DEFENDANTS' opioids are especially troubling.

353. First, the MANUFACTURING DEFENDANTS are using these claims in a spurious attempt to rehabilitate their image as responsible opioid Manufacturers.

354. Indeed, prescribers have reported that PURDUE DEFENDANTS has conveyed that its sale of AD opioids is "atonement" for its earlier sins even though its true motive was to preserve the profits it would have lost when its patent for OxyContin expired.

355. As such, PURDUE DEFENDANTS introduced its first AD opioid days before that patent would have expired and petitioned the FDA to withdraw its non-AD opioid as unsafe in an effort to prevent generic competition.

356. Second, these claims have falsely assuaged doctors' concerns about the toll caused by the explosion in opioid prescriptions and use and encouraged doctors to prescribe AD opioids under the mistaken belief that these opioids are safer, even though they are not.

**J. The MANUFACTURING DEFENDANTS Falsely Overstated the Positive Long-Term Outcomes of Opioids in Cases of Chronic Pain.**



58 of 142

357. The MANUFACTURING DEFENDANTS Falsely Overstated the Positive Long-Term Outcomes of Opioids in Cases of Chronic Pain.

358. A doctor's decision to prescribe any treatment, including opioids, always depends on the balancing of the risks posed by the treatment against the likely benefits from the treatment.

359. As described above, the MANUFACTURING DEFENDANTS repeatedly misrepresented the risks associated with opioids to persuade doctors, and consumers that opioids pose only minor risks that can be easily screened for, recognized, and avoided.

360. The MANUFACTURING DEFENDANTS also misrepresented the other side of the balance, falsely asserting that opioids produce positive long-term outcomes in cases of chronic pain.

361. As the 2016 CDC Guideline makes clear, there is "insufficient evidence to determine the long-term benefits of opioid therapy for chronic pain."

362. In fact, the CDC found that "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later (with most placebo-controlled randomized trials ≤ 6 weeks in duration)" and that other treatments were more or equally beneficial and less harmful than long-term opioid use.

363. The FDA also has recognized the lack of evidence to support long-term opioid use.

364. In 2013, the FDA stated that it was "not aware of adequate and well-controlled studies of opioids use longer than 12 weeks."



59 of 142

365. Despite this, the MANUFACTURING DEFENDANTS falsely and misleadingly touted the benefits of long-term opioid use, which they suggested were supported by scientific evidence.

366. For example, the MANUFACTURING DEFENDANTS falsely claimed that long-term opioid use improved patients' function and quality of life.

367. Examples of these deceptive claims include the following:

a. ACTAVIS distributed an advertisement that claimed that the use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on [their] body and [their] mental health," and help patients enjoy their lives.

b. ENDO DEFENDANTS distributed advertisements that claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks, like construction work or work as a chef, and portrayed seemingly healthy, unimpaired subjects.

c. JANSSEN sponsored and edited a patient education guide entitled Finding Relief: Pain Management for Older Adults (2009), which states as "a fact" that "opioids may make it easier for people to live normally." The guide lists expected functional improvements from opioid use, including sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs and states that "[u]sed properly, opioid medications can make it possible for people with chronic pain to 'return to normal.'"

d. PURDUE DEFENDANTS ran a series of advertisements for OxyContin in 2012 in medical journals entitled "Pain vignettes," which were case studies featuring



60 of 142

patients with pain conditions persisting over several months and recommending OxyContin for them. The ads implied that OxyContin improves patients' function.

e. Responsible Opioid Prescribing (2007), sponsored and distributed by ENDO DEFENDANTS and PURDUE DEFENDANTS, taught that relief of pain by opioids, by itself, improved patients' function. The book remains for sale online.

f. PURDUE DEFENDANTS and CEPHALON sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which counseled patients that opioids "give [pain patients] a quality of life [they] deserve." The guide was available online until APF shut its doors in May 2012.

g. ENDO DEFENDANTS' NIPC website painknowledge.com claimed in 2009 that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." Elsewhere, the website touted improved quality of life (as well as "improved function") as benefits of opioid therapy. The grant request that ENDO DEFENDANTS approved for this project specifically indicated NIPC's intent to make misleading claims about function, and ENDO DEFENDANTS closely tracked visits to the site.

h. ENDO DEFENDANTS was the sole sponsor, through NIPC, of a series of non-credit educational programs titled Persistent Pain in the Older Patient, which claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning." The CME was disseminated via webcast.



61 of 142

i. JANSSEN sponsored, funded, and edited a website, Let's Talk Pain, in 2009, which featured an interview edited by JANSSEN claiming that opioids allowed a patient to "continue to function." This video is still available today on YouTube.

j. PURDUE DEFENDANTS sponsored the development and distribution of APF's A Policymaker's Guide to Understanding Pain & Its Management, which claimed that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients." The Policymaker's Guide was originally published in 2011 and is still available online today.

k. In a 2015 video on Forbes.com discussing the introduction of Hysingla ER, PURDUE DEFENDANTS' Vice President of Health Policy, J. David Haddox, talked about the importance of opioids, including PURDUE DEFENDANTS' opioids, to chronic pain patients' "quality of life," and complained that CDC statistics do not take into account that patients could be driven to suicide without pain relief.

l. Since at least May 21, 2011, PURDUE DEFENDANTS', ENDO DEFENDANTS and JANSSEN's sales representatives have conveyed to prescribers in New York the message that opioids will improve patient function.

368. The scientific literature, as well as the FDA and other Federal agencies, have made it clear for years that the MANUFACTURER DEFENDANTS claims are false.

369. For example, the 2016 CDC Guideline concluded that "there is no good evidence that opioids improve pain or function with long-term use, and . . . complete relief of pain is unlikely."



62 of 142

370. In addition, the CDC stated that "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later" "Although opioids can reduce pain during short-term use, the clinical evidence review found insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improves with long-term opioid therapy." "[E]vidence is limited or insufficient for improved pain or function with long-term use of opioids for several chronic pain conditions for which opioids are commonly prescribed, such as low back pain, headache, and fibromyalgia."

371. The CDC also noted that the risks of addiction and death "can cause distress and inability to fulfill major role obligations."

372. As a matter of common sense (and medical evidence), drugs that can kill patients or commit them to a life of addiction or recovery do not improve their function and quality of life.

373. The 2016 CDC Guideline was not the first time a federal agency repudiated DEFENDANTS' claim that opioids improved function and quality of life.

374. In 2010, the FDA warned ACTAVIS, in response to its advertising, that "[w]e are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug [Kadian] has in alleviating pain, taken together with any drug-related side effects patients may experience . . . results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."

375. In 2008, the FDA sent a warning letter to a different opioid manufacturer, making clear "that [the claim that] patients who are treated with the drug experience an



63 of 142

improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."

376. In addition, PURDUE DEFENDANTS purposely promoted OxyContin as being unique among opioids in providing 12 continuous hours of pain relief with one dose.

377. However, OxyContin does not last for 12 hours, a fact that PURDUE DEFENDANTS has known at all times relevant to this action.

378. According to PURDUE DEFENDANTS' own research, OxyContin wears off in under six hours in one quarter of patients and in under 10 hours in more than half.

379. This is because OxyContin tablets release approximately 40% of their active medicine immediately, after which release tapers.

380. This triggers a powerful initial response but provides little or no pain relief at the end of the dosing period when less medicine is released.

381. This phenomenon is known as "end of dose" failure.

382. The FDA found in 2008 that a "substantial number" of chronic pain patients taking OxyContin experience said phenomenon.

383. This not only renders PURDUE DEFENDANTS' false promise of 12 hours of pain relief false and misleading, it also makes OxyContin more dangerous because the declining pain relief patients experience toward the end of each dosing period drives them to take more OxyContin before the next dosing period begins, quickly increasing the amount of the drug they are taking and spurring growing dependence.

384. Even PURDUE DEFENDANTS' competitors were aware of this problem.



64 of 142

385. For example, ENDO DEFENDANTS advertised Opana ER as "real" 12-hour dosing.

386. Nevertheless, PURDUE DEFENDANTS falsely promoted OxyContin as if it were effective for a full 12 hours.

387. Worse, PURDUE DEFENDANTS' sales representatives were instructed to tell doctors that OxyContin lasts a full 12 hours.

388. In addition, if a doctor suggested that OxyContin did not last 12 hours, these sales representatives, at PURDUE DEFENDANTS' instruction, recommended increasing the dose, rather than the frequency of use.

389. PURDUE DEFENDANTS gave its sales representatives these instructions to prevent doctors from switching to a different drug.

390. The MANUFACTURING DEFENDANTS' branded ads also deceptively portrayed the benefits of opioids for chronic pain.

391. For example, ENDO DEFENDANTS has distributed and made available on its website opana.com a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like construction worker and chef, misleadingly implying that the drug would provide long-term pain relief and functional improvement.

392. PURDUE DEFENDANTS also ran a series of ads, called "Pain Vignettes," for OxyContin in 2012 in medical journals.

393. One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively.

394. ENDO DEFENDANTS and PURDUE DEFENDANTS agreed in late 2015 and 2016 to halt these misleading representations in New York.



65 of 142

395. The MANUFACTURING DEFENDANTS also repeatedly made these representations in writing.

396. For example, in the APF publication Exit Wounds, DEFENDANTS described opioids as "the 'gold standard' of pain medications" and claimed that, if taken properly, opioids "increase a person's level of functioning."

397. These representations are false.

398. Medical research does not support the conclusion that opioids increase positive long-term outcomes in cases of chronic pain.

399. The MANUFACTURING DEFENDANTS knew that the representations described above were false, and they made those representations with intent to defraud.

400. The MANUFACTURING DEFENDANTS intentionally made the representations described herein to New York citizens, residents, and businesses, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS.

**K. The MANUFACTURING DEFENDANTS Falsely Represented the Relative Risks Associated with Non-Opioid Pain-Relief and Pain-Treatment Strategies.**

401. In addition to their misrepresentations regarding opioids, the MANUFACTURING DEFENDANTS also falsely and misleadingly emphasized or exaggerated the risks of competing products like NSAIDs, so that doctors and patients would favor opioids for treatment of chronic pain.

402. For example, the MANUFACTURING DEFENDANTS overstated the number of deaths from NSAIDs and prominently featured the risks of NSAIDs, while minimizing or failing to mention the serious risks of opioids.



66 of 142

403. Once again, the MANUFACTURING DEFENDANTS misrepresentations contravene scientifically supported pronouncements and guidance from the FDA and CDC.

404. Indeed, the FDA changed the labels for ER/LA opioids in 2013 and IR opioids in 2016 to state that opioids should only be used as a last resort "in patients for which alternative treatment options" like non-opioid drugs "are inadequate."

405. And the 2016 CDC Guideline states that NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis and lower back pain.

406. The CDC has emphasized that non-opioid therapies, such as cognitive behavioral therapy, exercise therapy, changes in diet or nutrition, and chiropractic and massage treatment are the "preferred" approach for treating chronic pain.

407. In addition, pharmaceutical alternatives to opioids include over-the-counter analgesics; NSAIDs; non-opioid prescription analgesics; and other drugs are recommended over opioids.

408. The CDC has concluded that extensive research shows that these non-opioid treatment options offer greater benefits than long-term opioid treatment for chronic pain.

409. The MANUFACTURING DEFENDANTS recognized that the availability of these alternatives would reduce the demand for their opioid products.

410. Consequently, to protect their profits the MANUFACTURING DEFENDANTS misrepresented both the risks and benefits associated with many alternative treatment options.



67 of 142

411. The MANUFACTURING DEFENDANTS repeatedly made these representations in writing.

412. For example, in the APF publication Exit Wounds, the MANUFACTURING DEFENDANTS represented that if NSAIDs are taken in high doses, they can have "life threatening" effects.

413. In the APF publication Treatment Options: A Guide for People Living with Pain, the MANUFACTURING DEFENDANTS represented that "NSAIDs can cause life-threatening side effects in some persons" and that "[t]here are 10,000 to 20,000 deaths each year because of the side effects of this class of medicines."

414. But the MANUFACTURING DEFENDANTS intentionally omitted the material fact that opioids, particularly at high doses, pose severe risks, including significant risks of overdose and death.

415. In the same publication, the MANUFACTURING DEFENDANTS represented that high doses of acetaminophen poses significant health risks, but they intentionally omitted the material fact that opioids also pose severe risks at high doses.

416. In these and other similar representations, the MANUFACTURING DEFENDANTS repeatedly emphasized the risks associated with alternative pain treatments without disclosing similar, and often much more severe, risks associated with opioids.

417. In reality, opioids pose more severe risks than do nearly all other pain-treatment options.



68 of 142

418. One study found that the risk of death from out-of-hospital use of opioids was almost twice as likely to result in death than the use of alternatives like analgesic anticonvulsants.

419. These intentional omissions rendered the MANUFACTURING DEFENDANTS' representations false, misleading, deceptive, and fraudulent.

420. As result, both doctors and consumers, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS, reasonably relied on these misrepresentations.

421. Consequently, and because of this reasonable reliance, many doctors prescribed opioids when they otherwise would not have, and many patients, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS, obtained opioids when they otherwise would not have.

422. In particular, the MANUFACTURING DEFENDANTS' misrepresentations led many doctors to prescribe opioids when they otherwise would have prescribed or recommended non-opioid alternative treatments.

423. And their misrepresentations led many consumers, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS, to take opioids when they otherwise would have requested and/or taken non-opioid alternatives.

424. The MANUFACTURING DEFENDANTS knew that the representations described herein were false, and they made those representations with intent to defraud.

425. The MANUFACTURING DEFENDANTS intentionally made the representations described herein to New York citizens, residents, and businesses, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS.

**K. The MANUFACTURING DEFENDANTS Engaged in Other Unlawful and Unfair Misconduct.**



69 of 142

426. In addition to the misrepresentations described above, the MANUFACTURING DEFENDANTS engaged in other misconduct, including failing to recognize or to act on knowledge that their opioids were being diverted, and targeting susceptible prescribers and vulnerable patient populations.

427. In addition, the MANUFACTURING DEFENDANTS failed to act on their knowledge of the diversion of their opioid drugs.

428. The MANUFACTURING DEFENDANTS are able to track the distribution and prescription of their opioids but failed to act on suspicious prescriptions.

429. To the contrary, they continued to provide incentives for doctors, including doctors who were flagged as suspicious subscribers, to prescribe their opioids.

430. For example, PURDUE DEFENDANTS, through its sales representatives, pressed doctors to prescribe its opioids in order to be rewarded with talks paid by PURDUE DEFENDANTS.

431. Doctors have reported that PURDUE DEFENDANTS sales representatives stated that they would no longer be asked to give paid talks unless they increased their prescribing of PURDUE DEFENDANTS' drugs.

432. Although the DEA has repeatedly informed PURDUE DEFENDANTS about its legal "obligation to design and operate a system to disclose . . . suspicious orders of controlled substances" and to inform the DEA "of suspicious orders when discovered," PURDUE DEFENDANTS unlawfully, and intentionally, failed to report or address illicit and unlawful prescribing of its drugs, despite knowing about it for years.



70 of 142

433. For more than a decade, PURDUE DEFENDANTS have been able to track the distribution and prescribing of its opioids down to the retail and prescriber levels.

434. Through its extensive network of sales representatives, PURDUE DEFENDANTS had knowledge of the prescribing practices of thousands of doctors in New York and could identify doctors who displayed red flags for diversion such as those whose waiting rooms were overcrowded, whose parking lots had numerous out-of-state vehicles, and whose patients seemed young and healthy or homeless.

435. Using this information, PURDUE DEFENDANTS have maintained a database since 2002 of doctors suspected of inappropriately prescribing its drugs.

436. Rather than report these doctors to state medical boards or law enforcement authorities (as PURDUE DEFENDANTS are legally obligated to do) or cease marketing to them, PURDUE DEFENDANTS used the list to demonstrate the high rate of diversion of OxyContin, the same OxyContin that PURDUE DEFENDANTS had promoted as less addictive, in order to persuade the FDA to bar the manufacture and sale of generic copies of the drug based on its assertion that the drug was too likely to be abused.

437. In an interview with the Los Angeles Times, PURDUE DEFENDANTS' senior compliance officer acknowledged that in five years of investigating suspicious pharmacies, PURDUE DEFENDANTS failed to act, even where PURDUE DEFENDANTS employees personally witnessed the diversion of its drugs.



71 of 142

438. For example, PURDUE DEFENDANTS failed to report for years a Los Angeles clinic, shut down by poice, that prescribed more than 1.1 million OxyContin tablets.

439. The same clinic was described by PURDUE DEFENDANTS' district manager as "an organized drug ring."

440. In 2016, the NY AG found that PURDUE DEFENDANTS' sales representatives, at various times, failed to timely report suspicious prescribing and continued to detail those prescribers even after they were placed on a "no-call" list.

441. Specifically, the NY AG found that PURDUE DEFENDANTS placed 103 New York health care providers on its "no-call" list between January 1, 2008 and March 7, 2015, and that PURDUE DEFENDANTS' sales representatives had detailed approximately two-thirds of these providers, some quite extensively, making more than a total of 1,800 sales calls to their offices over a six-year period.

442. The NY AG's settlement with PURDUE DEFENDANTS specifically cited the company for failing to adequately address suspicious prescribing.

443. Yet, on information and belief, PURDUE DEFENDANTS continue to profit from the prescriptions of such prolific prescribers.

444. Similarly, ENDO DEFENDANTS have been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing.

445. In its settlement agreement with ENDO DEFENDANTS, the NY AG found that ENDO DEFENDANTS failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives



72 of 142

for detailing prescribers who were subsequently arrested or convicted for illegal prescribing.

446. In addition, the NY AG concluded that the ENDO DEFENDANTS failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list.

447. The NY AG also found that, in certain cases where ENDO DEFENDANTS' sales representatives detailed prescribers who were convicted of illegal prescribing of opioids, those representatives could have recognized signs of diversion and reported those prescribers but failed to do so.

448. Specifically, the NY AG found that ENDO DEFENDANTS knew, as early as 2011, that Opana was being abused in New York.

449. However, certain sales representatives who detailed New York health care providers testified that they did not know about any policy or duty to report problematic conduct.

450. The NY AG further determined that ENDO DEFENDANTS detailed health care providers were subsequently arrested or convicted for illegal prescribing of opioids a total of 326 times, and these prescribers collectively wrote 1,370 scripts for Opana ER (although the subsequent criminal charges at issue did not involve Opana ER).

**L. The MANUFACTURING DEFENDANTS Specifically Targeted Susceptible Prescribers and Vulnerable Patient Populations.**

451. As a part of their deceptive marketing scheme, the MANUFACTURING DEFENDANTS identified and targeted susceptible prescribers and vulnerable patient populations, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS, in the United States, including New York State.



73 of 142

452. For example, they focused their deceptive marketing on primary care doctors, who were more likely to treat chronic pain patients and prescribe them drugs but were less likely to be schooled in treating pain and the risks and benefits of opioids and therefore more likely to trust the MANUFACTURING DEFENDANTS' misrepresentations.

453. The MANUFACTURING DEFENDANTS also targeted vulnerable patient populations like the elderly, veterans, and others, like DECEDENT ALIOTTA, who suffered from chronic pain, as well as the members of PLAINTIFF CLASS.

454. They targeted these vulnerable patients even though the risks of long-term opioid use were significantly greater for them.

**M. The MANUFACTURING DEFENDANTS Fraudulently Concealed Their Misconduct.**

455. The MANUFACTURING DEFENDANTS made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and misleading.

456. As described above, the medical community well-understood that opioids are highly addictive and dangerous.

457. Consequently, the MANUFACTURING DEFENDANTS had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths, all of which made clear the harms from long-term opioid use and that patients have been suffering from addiction, overdose, and death in alarming numbers.

458. More recently, the FDA and CDC have issued pronouncements based on the medical evidence that expose the MANUFACTURING DEFENDANTS' as liars.



74 of 142

459. The MANUFACTURING DEFENDANTS concealed their deceptive marketing including by disguising their role in the deceptive marketing of chronic opioid therapy by conspiring with Front Groups and KOLs.

460. The MANUFACTURING DEFENDANTS purposefully hid behind the apparent objectivity of these third parties, who lent credibility to their false and misleading statements about the risks and benefits of long-term opioid use for chronic pain.

461. The MANUFACTURING DEFENDANTS also hid their active role in shaping and approving the content of information and materials disseminated by these third parties.

462. The MANUFACTURING DEFENDANTS exerted considerable influence on these promotional and "educational" materials in private emails, correspondence, and meetings with KOLs, Front Groups, and public relations companies.

463. In addition, the MANUFACTURING DEFENDANTS distorted or omitted material facts in their promotional materials and influenced the scientific literature to create the false appearance that these materials were accurate, truthful, and supported by objective evidence when they were not.

464. The MANUFACTURING DEFENDANTS also mischaracterized the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support.

465. Medical professionals and patients, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS, relied on this misinformation.



75 of 142

466. In short, the MANUFACTURING DEFENDANTS successfully conspired to conceal from the medical community, patients, including DECEDENT ALIOTTA and CLASS MEMBERS, material facts that would have aroused suspicion of the claims set forth herein.

467. Plaintiff did not know of the existence or scope of the MANUFACTURING DEFENDANTS' industry-wide fraud until recently, when allegations of their wrongdoing became widespread, nor could Plaintiff have acquired such knowledge earlier through the exercise of reasonable diligence.

**N. The MANUFACTURING DEFENDANTS' Misinformation Campaign Resulted in Dramatic Increases in Opioid Use, Windfall Profits, and a Public-Health Crisis.**

468. The MANUFACTURING DEFENDANTS' misrepresentations deceived and continue to deceive doctors, and patients, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS, in New York about the risks and benefits of long-term opioid use.

469. Studies show that many doctors and patients, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS, are not aware of or do not understand these risks and benefits.

470. Patients, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS, often report that they were not warned they might become addicted to opioids prescribed to them.

471. A 2015 survey of more than 1,000 opioid patients found that 4 out of 10 were not told that opioids are potentially addictive.



76 of 142

472. Many New York residents in treatment for opioid addiction confirm that they were never told that they might become addicted to opioids when they started taking them.

473. In fact, DECEDENT ALIOTTA and members of PLAINTIFF CLASS was never warned that the opioid medications prescribed by their doctors, promoted to them by DEFENDANTS, could and would lead to addiction and death.

474. The MANUFACTURING DEFENDANTS knew and should have known that their misrepresentations about the risks and benefits of long-term opioid use were false and misleading when they made them.

475. The MANUFACTURING DEFENDANTS' deceptive marketing scheme and their unlawful and unfair business practices caused and continue to cause doctors in New York to prescribe opioids for chronic pain conditions such as back pain, headaches, arthritis, and fibromyalgia.

476. Absent the MANUFACTURING DEFENDANTS' deceptive marketing scheme and their unlawful and unfair business practices, these doctors would not have prescribed as many opioids to as many patients, and there would not have been as many opioids available for misuse and abuse or as much demand for those opioids.

477. The dramatic increase in opioid prescriptions and use corresponds with the dramatic increase in the MANUFACTURING DEFENDANTS' spending on their deceptive marketing scheme.

478. For instance, their spending on opioid marketing totaled approximately $91 million in 2000, however, by 2011, that spending tripled to $288 million.



77 of 142

479. The MANUFACTURING DEFENDANTS' deceptive marketing scheme worked, causing doctors to write an escalating number of opioid prescriptions.

480. That created a dramatic increase in opioid addiction, overdose, and death , including the death throughout the United States and New York, including the addiction and death of DECEDENT ALIOTTA and members of PLAINTIFF CLASS.

481. According to the CDC, between 1999 and 2014, sales of opioids nearly quadrupled.

482. In 2012 alone, approximately 259 million opioid prescriptions were written in the United States.

483. For context, the adult population of the United States is approximately 250 million: which means almost ten million more opioid prescriptions written each year than there are adults in the United States.

484. As a result, countless individuals have become addicted, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS, to opioids as a result of the use of opioids for chronic-pain treatment.

485. Representing the NIH's National Institute of Drug Abuse in hearings before the Senate Caucus on International Narcotics Control in May 2014, Dr. Nora Volkow explained that "aggressive marketing by pharmaceutical companies" is "likely to have contributed to the severity of the current prescription drug abuse problem."

486. In August 2016, U.S. Surgeon General Vivek Murthy published an open letter to be sent to physicians nationwide, enlisting their help in combating this "urgent health crisis" and linking that crisis to deceptive marketing. He wrote that the push to aggressively treat pain, and the "devastating" results that followed, had "coincided with



78 of 142

heavy marketing to doctors...[m]any of [whom] were even taught—incorrectly—that opioids are not addictive when prescribed for legitimate pain."

487. Not surprisingly, scientific evidence confirms a strong correlation between opioid prescriptions and opioid abuse.

488. In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses."

489. Patients receiving prescription opioids for chronic pain account for the majority of overdoses.

490. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid- related morbidity."

491. Contrary to the MANUFACTURING DEFENDANTS' misrepresentation, legitimately prescribed opioids lead to most opioid addiction, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS.

492. In addition, the MANUFACTURING DEFENDANTS' success in extending the market for opioids to new patients and chronic pain conditions created an abundance of drugs available for non-medical and criminal use and fueled a new wave of addiction and abuse, including the addictions of DECEDENT ALIOTTA and members of PLAINTIFF CLASS.

493. It has been estimated that 60% of the opioids that are abused come, directly or indirectly, through doctors' prescriptions.



79 of 142

494. The rise in opioid addiction caused by the MANUFACTURING DEFENDANTS' deceptive marketing scheme has also resulted in an explosion in heroin use, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS.

495. Almost 80% of those who used heroin in the past year previously abused prescription opioids, including DECEDENT ALIOTTA and members of PLAINTIFF CLASS.

496. Simply, when obtaining opioid prescriptions became too difficult or expensive, addicted individuals such as DECEDENT ALIOTTA and members of PLAINTIFF CLASS, turned to alternative opioid sources such as heroin.

**O. PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS Engaged in Unlawful and Unfair Misconduct.**

497. PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS distributed opioids and failed to monitor, investigate, refuse, or report suspicious orders of prescription opioids, flooding states with the drugs.

498. PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS also knew that they were selling too many pills, creating addiction and a black market, but did nothing about it.

499. In addition, the PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS could and should have prevented the brunt of the opioid epidemic, but instead allowed the country to be flooded with prescription opioids.

500. Under federal law, distributors of prescription medications, including but not limited to opioids, are required to secure and monitor drugs as they travel through commerce, to protect them from theft, and to reject and report suspicious or unusual orders by downstream pharmacies, doctors, or patients.



80 of 142

501. But the PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS neglected this duty, turning a blind eye to known or knowable problems in their own supply chains.

502. By doing so, the PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS created conditions in which vast amounts of opioids flowed freely from the MANUFACTURING DEFENDANTS to abusers and drug dealers, with the DISTRIBUTING DEFENDANTS readily fulfilling suspicious orders and ignoring red flags that would require further investigation and resolution.

503. This behavior by the PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS has allowed massive amounts of opioids to be diverted from legitimate channels of distribution into the illicit black market, fueling the opioid epidemic.

504. The PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS created, or at the very least allowed, an environment in which drug diversion flourished.

505. For years, the PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS have had the ability to substantially reduce the death toll and adverse economic consequences of opioid diversion but opted to pursue corporate revenues instead.

**P. The PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS had a Duty to Exercise Reasonable Care in Distributing Opioid Drugs.**

506. The PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS have duties under New York common law, as well as federal laws, to exercise reasonable care and not to create a foreseeable risk of harm to others.



81 of 142

507. The PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS also are required to comply with the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 et seq. and its implementing regulations, which govern the distribution and dispensing of controlled substances.

508. There are also New York State laws requiring the PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS to monitor opioid distribution and report suspicious activity concerning same.

509. Among other reasons, Congress passed the CSA to protect against "the widespread diversion of [controlled substances] out of legitimate channels into the illegal market." H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566, 4572.

510. The CSA regulates the distribution of drugs from the manufacturing level through delivery to the patient. Opioid Distributors are required to maintain effective controls against opioid diversion. They are also required to create and employ a system to identify and report suspicious orders of controlled substances to law enforcement authorities.

511. Suspicious orders include orders of unusual size or frequency, or otherwise deviating substantially from normal patterns.

512. To comply with these requirements, Distributions must know their customers, report suspicious orders, conduct due diligence, and terminate orders if there are indications of diversion.

513. To prevent unauthorized users from obtaining opioids, the CSA created a distribution monitoring system for controlled substances based on the registration and tracking requirements imposed on Distribution of controlled substances.



82 of 142

514. The DEA's Automation of Reports and Consolidation Orders System ("ARCOS") is an automated drug reporting system that monitors the flow of Schedule II controlled substances from their point of manufacture through commercial distribution channels to point of sale.

515. ARCOS accumulates data on acquisition and distribution transactions, which are then summarized into reports used by the DEA to identify possible diversion of controlled substances into illicit channels of distribution.

516. In addition to filing acquisition and distribution transaction reports, registrants are required to maintain complete and accurate records of each substance manufactured, imported, received, sold, delivered, exported, or otherwise disposed of. See 21 U.S.C. §§ 827(a)(3), 1304.2l (a), 1304.22(b).

517. It is unlawful to fail to abide by said recordkeeping and reporting requirements.

518. Distributors of controlled substances also are required to maintain effective controls against diversion of controlled substances into other than legitimate medical, scientific and industrial channels.

519. When determining if a distributor has provided effective controls, the DEA Administrator refers to the security requirements set forth in the regulations, which provide standards for the physical security controls and operating procedures necessary to prevent diversion. See 21 C.F.R. § 1301.71.

520. Because the PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS were already purporting to monitor and report on opioid transactions,



83 of 142

their utter failure to take reasonable precautions to ensure the accuracy of their reports was an inexcusable breach of common law duty.

521. In addition, the PHARMACY DEFENDANTS AND DISTRIBUTING DEFENDANTS failure to recognize, or willful ignorance of, the diversion of opioids.

**P. The PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS Intentionally, Knowingly and/or Negligently Facilitated Widespread Distribution of Opioids.**

522. Opioid diversion has been a widely publicized problem for years.

523. Numerous publications, studies, agencies, and professional organizations have highlighted the dangerous rates of opioid abuse and overdose across the country and in New York.

524. To address the problem of opioid diversion, the FDA, CDC and DEA have provided guidance to distributors in the form of publications, agency actions, and other documents on the requirements of suspicious order reporting.

525. For over a decade, the DEA has conducted one-on-one briefings with Distributions regarding downstream customer sales and prudent due diligence steps.

526. The DEA provided distributors with information on controlled substance distribution patterns and trends, including data on order volume, order frequency, and the ratio of controlled to non-controlled purchases.

527. Distributions were also given case studies, legal findings against other registrants, and ARCOS profiles of their customers whose previous purchases may have reflected suspicious ordering patterns.

528. The DEA highlighted "red flags" that Distributions should look for in order to identify potential diversion.



84 of 142

529. The DEA implemented this initiative to help distributors understand their duties with respect to diversion control.

530. In addition, the DEA hosted numerous conferences to provide registrants with updated information about diversion trends and regulatory changes affecting the drug supply chain, the Distributing initiative, and suspicious order reporting.

531. The DISTRIBUTING DEFENDANTS attended these conferences, which also provided opportunities to ask questions and raise concerns.

532. The DEA also participated in numerous meetings and events with the Healthcare Distribution Management Association ("HDMA"), which is now known as the Healthcare Distribution Alliance ("HDA"): an industry trade association for drug wholesalers and Distributors.

533. DEA representatives have provided guidance concerning suspicious order monitoring to the HDA, which has published guidance documents for members on suspicious order monitoring, reporting requirements, and diversion of controlled substances.

534. In addition, the DEA Office of Diversion Control sent letters dated September 27, 2006 and December 27, 2007 to all registered Distributors providing guidance on suspicious order monitoring of controlled substances and the responsibilities of registrants to conduct due diligence on customers of controlled substances.

535. The September 27, 2006 letter reminded registrants that they are required by law to exercise due diligence to avoid filling orders that may be diverted into the illicit market.



85 of 142

536. It explained that as part of the legal obligation to maintain effective controls against diversion, Distributions are required to exercise due care in confirming the legitimacy of all orders prior to filling. It also described indicia of diversion, including orders of excessive quantities of a limited variety of controlled substances, disproportionate ratios of controlled substances to non-controlled prescription drugs, excessive quantities of a limited variety of controlled substances in combination with lifestyle drugs, and orders of the same controlled substance from multiple Distributions. The letter went on to describe what questions should be answered by a customer when attempting to determine whether an order is suspicious.

537. On December 27, 2007, the Office of Diversion Control sent a follow-up letter to DEA registrants providing guidance and reiterating the legal requirements. The letter reminded registrants that suspicious orders must be reported promptly and simply on monthly transaction reports. It also advised that registrants must perform independent analyses of suspicious orders prior to the sales to determine if diversion appears likely, and that filing suspicious order reports and then completing the sales does not absolve registrants from legal responsibility. Finally, the letter directed registrants to review a recent DEA action that addressed criteria in determining suspicious orders and the obligation to maintain effective controls against diversion.

538. DISTRIBUTING DEFENDANTS also were notified by their own industry group, the HDMA, which published Industry Compliance Guidelines entitled "Reporting Suspicious Orders and Preventing Diversion of Controlled Substances," which emphasized the responsibilities of each member of the supply chain in distributing controlled substances.



86 of 142

539. These industry guidelines further stated that "At the center of a sophisticated supply chain, Distributions are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."

540. PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS have acknowledged the magnitude of the problem and their legal responsibilities to prevent diversion, and they have issued statements assuring the public they were supposedly undertaking a duty to curb the opioid epidemic.

541. For example, a CARDINAL executive claimed that it uses "advanced analytics" to monitor its supply chain and that CARDINAL was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."

542. Similarly, MCKESSON has publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders" and that it is "deeply passionate about curbing the opioid epidemic in our country."

543. Based on such assurances, in addition to the obligations imposed by law, the PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS had a duty to protect the public against diversion from their supply chains.

544. However, despite these types of statements, the PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS have knowingly or negligently allowed diversion.



87 of 142

545. As a result of their misconduct, the DISTRIBUTING DEFENDANTS have paid numerous civil fines and other penalties to state and federal regulators, including actions by the DEA for violations of the CSA.

546. For example, in 2008, CARDINAL paid a $34 million penalty to settle allegations by the DEA about opioid diversion taking place at seven of its warehouses around the United States.

547. In 2012, CARDINAL reached an administrative settlement with the DEA relating to opioid diversion between 2009 and 2012 in New York.

548. And in December 2016, the U.S. Department of Justice announced another $34 million settlement with CARDINAL for civil penalties under the CSA.

549. In connection with the investigations of CARDINAL, the DEA uncovered evidence that CARDINAL's own investigator had warned CARDINAL against selling opioids to a particular pharmacy in New York that was suspected of opioid diversion.

550. CARDINAL did nothing to notify the DEA or to cease the supply of drugs to the suspect pharmacy.

551. Instead, CARDINAL's opioid shipments to the pharmacy increased, to almost 2 million doses of oxycodone in one year, while other comparable pharmacies received approximately 69,000 doses per year.

552. Similarly, in May 2008, MCKESSON entered into a settlement agreement with the DEA to settle claims that it had failed to maintain effective controls against diversion of controlled substances.



88 of 142

553. MCKESSON allegedly failed to report suspicious orders from rogue Internet pharmacies around the country, resulting in the diversion of millions of doses of controlled substances.

554. MCKESSON agreed to pay a $13.25 million civil fine. It was subsequently revealed that MCKESSON's system for detecting "suspicious orders" from pharmacies was so ineffective that at one of its facilities in Colorado, between 2008 and 2013, it had filled more than 1.6 million orders, but reported just 16 orders from a single customer as suspicious.

555. In 2015, MCKESSON was again alleged to have "suspicious order reporting practices for controlled substances."

556. In 2017, MCKESSON agreed to pay a record $150 million civil penalty to the federal government to settle opioid diversion claims relating to diversion at 12 distribution centers in 11 states.

557. In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center amid allegations that it was not controlling shipments of prescription opioids to Internet pharmacies.

558. In 2012, AmerisourceBergen was again investigated for failing to protect against diversion of controlled substances into non-medically necessary channels.

559. It has been reported that the U.S. Department of Justice subpoenaed AmerisourceBergen for documents in connection with a grand jury proceeding seeking information on the company's "program for controlling and monitoring diversion of controlled substances into channels other than for legitimate medical, scientific and industrial purposes."



89 of 142

560. Unfortunately, all of these fines do not help the mother or infant daughter of DECEDENT ALIOTTA or members of the PLAINTIFF CLASS in any manner whatsoever.

561. Further, despite these and other penalties and settlements with law enforcement authorities over the past decade, the PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS have continued to allow diversion of opioids to maximize their revenue.

562. Although the PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS had the ability and duty to prevent opioid diversion, they continued to allow it, which enabled the opioid crisis to reach epidemic proportions.

563. The PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS have supplied huge quantities of prescription opioids in New York with actual or constructive knowledge that the opioids were ultimately being consumed for non-medical purposes.

564. Many of these shipments should have been stopped or investigated as suspicious orders, but the DISTRIBUTING DEFENDANTS negligently or intentionally failed to do so.

565. The PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS knew or should have known that the amounts of opioids that they allowed to flow into New York were far in excess of what could be consumed for medically necessary purposes in the relevant communities.

566. The DISTRIBUTING DEFENDANTS negligently or intentionally failed to adequately control their supply lines to prevent diversion.



90 of 142

567. A reasonably-prudent distributor of Schedule II controlled substances would have protected against the danger of opioid diversion by: taking greater care in hiring, training, and supervising employees; providing greater oversight, security, and control of supply channels; more carefully scrutinizing the pharmacists and doctors who were purchasing large quantities of commonly-abused opioids in amounts greater than the populations in those areas would warrant; investigating demographic factors concerning the increasing demand for narcotic painkillers in certain communities; proactively providing information to pharmacies and retailers about opioid diversion; and at a bare minimum, following applicable statutes, regulations, professional standards, and guidance from government agencies.

568. The DISTRIBUTING DEFENDANTS made insufficient efforts to monitor or to perform due diligence to ensure that the controlled substances they had furnished were not being diverted to illegal uses.

569. However, stopping the unbearable pain caused by the opioid epidemic was trumped by the desire to maximize profits.

570. For the PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS profits where more important than people.

571. On information and belief, the DISTRIBUTING DEFENDANTS compensated certain of their employees, at least in part, based on the volume of their sales of opioids, thus improperly creating incentives that contributed to opioid diversion and the resulting epidemic of opioid abuse.

572. It was reasonably foreseeable to the PHARMACY DEFEDENTS and DISTRIBUTING DEFENDANTS that their conduct in flooding the market with highly



91 of 142

addictive opioids would allow opioids to fall into the hands of addicts, criminals, vulnerable populations, and other unintended users.

573. It was also reasonably foreseeable to the PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS that, when unintended users gained access to opioids, tragic preventable injuries would result, including addiction, overdose, and death, including the addiction, overdose and death of DECENDENT ALIOTTA and members of the PLAINTIFF CLASS, in New York and throughout the United States.

574. The PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS knew or should have known that the opioids being diverted from their supply chains would contribute to the opioid epidemic and would create access to opioids by unauthorized users, which, in tum, would perpetuate the cycle of addiction, demand, and illegal transactions.

575. The PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS knew or should have known that a substantial amount of the opioids dispensed in and to New York were being dispensed based on invalid or suspicious prescriptions.

576. It is foreseeable that filling suspicious orders for opioids will cause harm to individuals such as DECENDENT ALIOTTA and the members of the PLAINTIFF CLASS.

577. The PHARMACY DEFENDANST and DISTRIBUTING DEFENDANTS were aware of widespread prescription opioid abuse throughout the country and in New York, but they nevertheless persisted in a pattern of distributing commonly abused and diverted opioids in geographic areas and in such quantities, and



92 of 142

with such frequency that they knew or should have known these commonly abused controlled substances were not being prescribed and consumed for legitimate medical purposes.

578. The use of opioids by New York citizens who were addicted, such as DECENDENT ALIOTTA and members of the PLAINTIFF CLASS could not occur without the knowing cooperation and assistance of the PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS.

579. If the PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS had implemented and enforced effective controls to guard against diversion, New York and its citizens, including DECENDENT ALIOTTA and members of the PLAINTIFF CLASS would have avoided addiction and death.

580. The PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS made substantial profits from their distribution of opioids in New York, including opioids that they knew or should have known were being diverted to improper channels.

**Q. All DEFENDANTS Acted Wantonly, Willfully, Outrageously, and with Reckless Disregard for the Consequences of Their Actions.**

581. When engaging in the conduct described herein, all DEFENDANTS acted wantonly, willfully, outrageously, and with reckless disregard for the consequences of their actions.

582. All DEFENDANTS knew and should have known about these harms that their unlawful and unfair business practices have caused and continue to cause in New York and specifically to DECENDANT ALIOTTA and members of the PLAINTIFF CLASS.



93 of 142

583. The MANUFACTURING DEFENDANTS closely monitored their sales and the habits of prescribing doctors.

584. Their sales representatives, who visited doctors and attended CMEs, knew which doctors were receiving their messages and how they were responding.

585. They intended that their misrepresentations would persuade doctors in New York to prescribe and patients in New York to use their opioids for chronic pain.

586. As a direct result DECENDENT ALIOTTA and members of the PLAINTIFF CLASS became addicted and died.

587. Likewise, the PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS knew of the risks and signs of diversion, and yet failed to take action that would have prevented or mitigated opioid diversion.

588. As a direct result DECENDENT ALIOTTA and members of the PLAINTIFF CLASS became addicted and died.

589. All DEFENDANTS also had access to and watched carefully government and other data that tracked the explosive rise in opioid use, addiction, injury, and death.

590. At all relevant times, all DEFENDANTS knew that the likely consequences of their actions would be that millions of individuals would become addicted to opioids and other drugs, which in turn would destroy countless families and communities across the nation and in New York.

591. Despite this knowledge, DEFENDANTS engaged in the conduct described herein for the purpose of obtaining billions of dollars in windfall profits, while destroying the lives of countless New Yorkers.

**FIRST CAUSE OF ACTION**
**Violations of New York General Business Law § 349**



94 of 142

**(ESTATE PLAINTIFFS and PLAINTIFF CLASS as against all DEFENDANTS)**

592. ESTATE PLAINTIFFS and PLAINTIFF CLASS incorporate, repeat, reiterate, and reallege each and every allegation contained in the paragraphs above as if fully set forth herein at length.

593. New York General Business Law Section 349 ("GBL § 349") prohibits any "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]."

594. DEFENDANTS violated GBL § 349 because they engaged in deceptive acts or practices in the conduct of business, trade, or commerce in New York, as set forth above.

595. DEFENDANTS business activities were consumer-oriented; they made numerous material misstatements; and ESTATE PLAINTIFFS and PLAINTIFF CLASS suffered injury as a result.

596. DEFENDANTS knew and should have known at the time of making or disseminating the misleading statements described above, or causing these statements to be made or disseminated, that such statements were false and misleading and therefore likely to deceive the public. Their omissions, which are deceptive and misleading in their own right, render even seemingly truthful statements about opioids false and misleading.

597. The conduct of the DEFENDANTS, as set forth herein, separately and collectively, was likely to deceive New York residents.



95 of 142

598. DEFENDANTS business practices as described in this Complaint are unlawful and violate GBL § 349. These deceptive practices include, but are not limited to:

a. DEFENDANTS falsely advertised and manufactured, sold, delivered, held, or offered for sale opioids that had been falsely advertised in violation of New York General Business Law Section 350 ("GBL § 350").

b. DEFENDANTS represented that opioids had sponsorship, approval, characteristics, ingredients, uses, or benefits which they did not have in violation of GBL § 350;

c. DEFENDANTS represented that opioids were of a particular standard, quality, or grade when they were of another in violation of GBL § 350;

d. DEFENDANTS disparaged the goods of another by false or misleading representation of fact in violation of GBL § 350;

e. DEFENDANTS unlawfully failed to identify and report suspicious prescribing to law enforcement and health authorities;

f. DEFENDANTS made or disseminated, directly or indirectly, untrue, false, or misleading statements about the use of opioids to treat chronic pain, or causing untrue, false, or misleading statements about opioids to be made or disseminated to the general public;

g. PURDUE DEFENDANTS directly or indirectly offered or paid remuneration to doctors to prescribe its opioid products; and



96 of 142

599. MANUFACTURING DEFENDANTS and DISTRIBUTING DEFENDANTS violated the policy, reflected in New York Codes, Rules and Regulations, Title 10, Section 80.22, requiring Manufacturers to report suspicious orders to authorities.

600. DEFENDANTS were in the position to implement effective business practices to guard against diversion of the highly addictive opioid products they sell and distribute.

601. Instead, they profited off the opioid epidemic by ignoring anti-diversion laws, while burdening New York consumers, including DECEDENT ALIOTTA and members of the PLAINTIFF CLASS,  by their conduct and profiting from the sale of prescription opioids in quantities that far exceeded the number of prescriptions that could reasonably have been used for legitimate medical purposes, despite having notice or actual knowledge of widespread opioid diversion from prescribing records, pharmacy orders, field reports, and sales representatives.

602. DEFENDANTS conduct constitutes an unlawful, unfair, or fraudulent business practice, including the prescribing and filling of suspicious or invalid orders for prescription opioids at both the wholesale and retail levels; failing to maintain effective controls against opioid diversion; failing to operate an effective system to disclose suspicious orders of controlled substances; failing to report suspicious orders of controlled substances; failing to reasonably maintain necessary records of opioid transactions; and deliberately ignoring questionable and/or obviously invalid prescriptions and filling them anyway—all while purporting to have world-class and compliant systems, controls, and practices.

603. DEFENDANTS business practices as described in this Complaint are deceptive acts and practices that violate GBL § 349 because they offend established public policy,



97 of 142

and because the harm they cause to consumers in New York greatly outweighs any benefits associated with those practices.

604. In particular their actions and or lack of action caused the death of DECENDENT ALIOTTA and members of the PLAINTIFF CLASS.

605. As a direct and proximate result of the foregoing acts and practices, DEFENDANTS have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of GBL § 349 described in this Complaint.

606. ESTATE PLAINTIFFS and PLAINTIFF CLASS are among the broad class of persons that may avail themselves of a remedy under GBL § 349.

607. ESTATE PLAINTIFFS and PLAINTIFF CLASS have been injured by reason of DEFENDANTS' violations of GBL § 349.

608. Plaintiff therefore seeks restitution from DEFENDANTS pursuant to GBL § 349.

609. As a direct and proximate result of DEFENDANTS' acts and/or omissions and/or conduct, ESTATE PLAINTIFFS and PLAINTIFF CLASS have sustained and will continue to sustain severe emotional distress, mental anguish, economic losses and other damages for which they are entitled to consequential, compensatory and equitable damages in an amount to be proven at trial.

610. Plaintiffs are entitled to damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
**Violations of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, et seq.**
**(ESTATE PLAINTIFFS and PLAINTIFF CLASS as against PHARMACY DEFENDANTS and MANUFACTURING DEFENDANTS and DISTRIBUTING DEFENDANTS)**



98 of 142

611. ESTATE PLAINTIFFS and PLAINTIFF CLASS incorporate, repeat, reiterate, and reallege each and every allegation contained in the paragraphs above as if fully set forth herein at length.

612. At all relevant times, all of the PHARMACY DEFENDANTS and MANUFACTURING DEFENDANTS and DISTRIBUTING DEFENDANTS were and are a "person" within the meaning of 18 U.S.C. § 1961(3), because they are capable of holding, and do hold, "a legal or beneficial interest in property."

613. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . " 18 U.S.C. § 1962(c). Each Defendant conducted and participated in the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

614. PHARMACY DEFENDANTS and MANUFACTURING DEFENDANTS and DISTRIBUTING DEFENDANTS formed an association-in-fact Enterprise and participated in the affairs of the Enterprise to increase the market for opioids through a pattern of racketeering activity.

615. The Enterprise consists of (1) the MANUFACTURING DEFENDANTS, including their employees and agents, (2) Front Groups, including their employees and agents, (3) the KOLs, and (4) the DISTRIBUTING DEFENDANTS, including their employees and agents.

616. The Enterprise's purpose was to fabricate a new market for opioids in chronic pain treatment and sell as many opioid products as possible through deception and



99 of 142

willfully ignoring requirements to curtail the illegal drug market that the Enterprise's conduct created.

617. To accomplish this purpose, the Enterprise systematically misrepresented to the general public, doctors, and insurers the risks of using opioids for chronic pain, and flouted requirements to investigate and prevent the ensuing waive of suspicious orders.

618. The PHARMACY DEFENDANTS and MANUFACTURING DEFENDANTS, Front Groups, KOLs, and DISTRIBUTING DEFENDANTS all conducted and participated in the affairs of the Enterprise by distributing false statements through the wires or mail or by violating the Controlled Substances Act.

619. This campaign of illegality and misinformation translated into profits for all DEFENDANTS, and funding and payments to Front Groups and KOLs.

620. The participants in the Enterprise are systematically linked through contractual relationships, financial ties, and continued coordination of activities, spearheaded by the MANUFACTURING DEFENDANTS.

621. There is regular communication between the PHARMACY DEFENDANTS and MANUFACTURING DEFENDANTS, DISTRIBUTING DEFENDANTS, Front Groups, and KOLs in which information is shared.

622. This communication typically occurs, and continues to occur, through the use of the wires and mail in which the participants share information regarding overcoming objections to the use of opioids for chronic pain.

623. The DISTRIBUTING DEFENDANTS were willing participants in, and beneficiaries of, the Enterprise's campaign of deception. The DISTRIBUTING DEFENDANTS profited from the Enterprise's newly expanded opioid market and



100 of 142

furthered the Enterprise's goal of profiting from that market by flouting legal requirements to report suspicious ordering.

624. By the DISTRIBUTING DEFENDANTS' violating the CSA's requirements to prevent diversion, all DEFENDANTS were able to profit from both the legal and illegal drug markets created by the Enterprise's success in establishing the long-term opioid treatment market and the ensuing addiction crisis.

625. The DISTRIBUTING DEFENDANTS were aware of the campaign of deception engineered by the MANUFACTURING DEFENDANTS, KOLs, and Front Groups, but sought only to profit from the Enterprise's deception.

626. The DISTRIBUTING DEFENDANTS are intimately connected with the MANUFACTURING DEFENDANTS through their industry organization, the HAD.

627. According to the HDA's website, the HDA's executive committee includes an executive from each Distributing Defendant.

628. Upon information and belief, each Manufacturing Defendant is also a member of HDA.

629. HDA specifically advertises its benefits as a forum for meeting with Distributors.

630. The DISTRIBUTING DEFENDANTS used membership in the HDA as an opportunity to create working relationships with MANUFACTURING DEFENDANTS.

631. HDA, in turn, is a member of PCF.

632. Each Manufacturing Defendant, or a related company, is a member of PCF.

633. Together, MANUFACTURING DEFENDANTS and DISTRIBUTING DEFENDANTS lobbied state governments and Congress to undermine enforcement and legal limitations that would otherwise have interfered with increased opioid sales.



101 of 142

634. Between 2006 and 2015, the PCF spent more than $740 million lobbying to influence local, state and federal governments, including on opioid-related measures.

635. The HDA and PCF lobbied for passage of the Ensuring Patient Access and Effective Drug Enforcement Act, which hobbled the DEA's ability to suspend or revoke registrations, permitting DISTRIBUTING DEFENDANTS to further the Enterprise's goal of increasing opioid sales without regard to legal requirements or the effects on New York residents.

636. DEFENDANTS' coordination through the HDA, PCF, and lobbying activities, are evidence of DEFENDANTS' knowledge of the structure of the Enterprise and purposeful participation in it.

637. At all relevant times, Front Groups were knowing and willing participants in the Enterprise's conduct, and reaped benefits from that conduct.

638. Each Front Group also knew, but did not disclose, that the other Front Groups were engaged in the same scheme.

639. But for the Enterprise's unlawful scheme, Front Groups would have had the incentive to disclose the deceit by the MANUFACTURING DEFENDANTS to their members and constituents.

640. By failing to disclose this information, Front Groups perpetuated the Enterprise's scheme and reaped substantial benefits.

641. At all relevant times, KOLs were knowing and willing participants in the Enterprise's conduct, and reaped profits from that conduct.

642. The MANUFACTURING DEFENDANTS selected KOLs solely because they favored the aggressive treatment of chronic pain with opioids.



102 of 142

643. The MANUFACTURING DEFENDANTS' support helped these doctors become respected industry experts.

644. And, as they rose to prominence, these doctors touted the benefits of opioids to treat chronic pain, repaying the MANUFACTURING DEFENDANTS by advancing their marketing goals

645. The KOLs also knew, but did not disclose, that the other KOLs and Front Groups were engaged in the same scheme, to the detriment of DECENDENT ALIOTTA and members of the PLAINTIFF CLASS.

646. But for the Enterprise's unlawful scheme, KOLs would have been incentivized to disclose the deceit, and to protect their patients and the patients of other physicians.

647. By failing to disclose this information, KOLs perpetuated the Enterprise's scheme, and reaped substantial benefits.

648. Furthermore, as public scrutiny and media coverage have focused on how opioids have ravaged communities throughout the United States, the Front Groups and KOLs did not challenge the MANUFACTURING DEFENDANTS' misrepresentations, seek to correct their previous misrepresentations, terminate their role in the Enterprise, nor disclose publicly that the risks of using opioids for chronic pain outweighed their benefits.

649. The Front Groups and KOLs participated in the conduct of the Enterprise, sharing the common purpose of marketing opioids for chronic pain and, through a pattern of racketeering activity including multiple instances of wire and mail fraud, knowingly made material misstatements to physicians, consumers, and the general public in furtherance of the scheme, including that:



103 of 142

a. it was rare, or there was a low risk, that the MANUFACTURING DEFENDANTS' opioids could lead to addiction;

b. the signs of addiction were actually signs of undertreated pain, known as "pseudoaddiction," that should be treated by more opioids;

c. doctors and patients could increase opioid dosages indefinitely without risk; and

d. long-term opioid use improved patients' function and quality of life.

650. Without the misrepresentations of the Front Groups and KOLs, who were perceived as neutral and scientific, DEFENDANTS alone could not have accomplished the purposes of the Enterprise.

651. During the time period described in this Complaint, the MANUFACTURING DEFENDANTS exerted control over the Enterprise and participated in the operation and management of the affairs of the Enterprise, directly or indirectly, in the following ways:

a. The MANUFACTURING DEFENDANTS created a body of deceptive and unsupported medical and popular literature about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

b. The MANUFACTURING DEFENDANTS selected, cultivated, promoted, and paid the KOLs based solely on their willingness to communicate and distribute the MANUFACTURING DEFENDANTS' messages about the use of opioids for chronic pain;

c. The MANUFACTURING DEFENDANTS provided substantial opportunities for KOLs to participate in research studies on topics the MANUFACTURING



104 of 142

DEFENDANTS suggested or chose, with the predictable effect of ensuring that many favorable studies appeared in the academic literature;

d. The MANUFACTURING DEFENDANTS paid KOLs to serve as consultants or on their advisory boards and to give talks or present CMEs, typically over meals or at conferences;

e. The MANUFACTURING DEFENDANTS disseminated many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications from Front Groups;

f. The MANUFACTURING DEFENDANTS sponsored CME programs put on by Front Groups that focused exclusively on the use of opioids for chronic pain;

g. The MANUFACTURING DEFENDANTS developed and disseminated pro-opioid treatment guidelines;

h. The MANUFACTURING DEFENDANTS encouraged Front Groups to disseminate their pro- opioid messages to groups targeted by the MANUFACTURING DEFENDANTS, such as veterans and the elderly, and then funded that distribution;

i. The MANUFACTURING DEFENDANTS concealed their relationship to and control of Front Groups and KOLs from the State and the public at large;

j. The MANUFACTURING DEFENDANTS intended that Front Groups and KOLs would distribute, through the U.S. mail and interstate wire facilities, promotional and other materials that claimed opioids could be safely used for chronic pain; and



105 of 142

k. The MANUFACTURING DEFENDANTS, Front Groups, and KOLs minimized the fact that opioids were being diverted due to the DISTRIBUTING DEFENDANTS' misconduct.

652. During the time period described in this Complaint, the PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS conducted and participated in the affairs of the Enterprise in the following ways:

a. The PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS violated the Controlled Substances Act and caused massive diversion of opioids by failing to investigate suspicious orders;

b. The PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS violated the Controlled Substances Act by failing to maintain adequate controls against diversion of prescription opioids;

c. The PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS refused to identify, investigate or report suspicious orders of prescription opioids being diverted into the illicit drug market; and

d. The PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS made false and misleading statements attempting to minimize their responsibility for preventing diversion and representing that they complied with the law.

653. The scheme had a hierarchical decision-making structure that was headed by the MANUFACTURING DEFENDANTS.

654. The MANUFACTURING DEFENDANTS controlled representations made about their drugs and doled out funds to Front Groups and payments to KOLs to ensure that



106 of 142

their representations were consistent with the MANUFACTURING DEFENDANTS' messaging nationwide and throughout the State of New York.

655. Front Groups were dependent on the MANUFACTURING DEFENDANTS for their financial support, and KOLs were professionally dependent on the MANUFACTURING DEFENDANTS for the development and promotion of their careers.

656. The PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS worked hand-in-hand with the MANUFACTURING DEFENDANTS to limit government enforcement and increase sales of opioids through industry groups like the HDA and the PCF.

657. For the foregoing reasons, all DEFENDANTS, Front Groups, and KOLs were each willing participant in the Enterprise, had a common purpose and interest in furthering opioid prescribing and increasing sales of opioids without regard to diversion, and functioned within a structure designed to effectuate the common purpose.

658. The scheme devised and implemented by PHARMACY DEFENDANTS and MANUFACTURING DEFENDANTS and DISTRIBUTING DFENDANTS, as well as other members of the Enterprise, amounted to a common course of conduct intended to encourage the prescribing and use of opioids for chronic pain and thereby secure payment from insurers for DEFENDANTS' opioids.

659. The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

660. The Enterprise was intended to and did affect interstate commerce, in that the statements made by the members of the Enterprise were passed through the wires or mail



107 of 142

over state lines, and that the Enterprise increased sales of opioids through the channels of interstate commerce.

**B. Pattern of Racketeering Activity**

661. Racketeering activity includes mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343. 18 U.S.C. § 1961.

662. The DEFENDANTS, Front Groups, and KOLs all made misrepresentations detailed above in service of a scheme to deceive which was intended to, and did, deceive consumers, doctors and insurers about the safety and efficacy of opioid use.

663. All were passed through the wires and/or mail, and constituted predicate acts within the meaning of RICO, including:

a. The dissemination via wires and mail of APF's Treatment Options beginning in 2007 and continuing afterward, which misrepresented the risks of addiction, promulgated the false concept of pseudoaddiction, falsely represented that doctors and patients could increase opioid dosages without risk, and falsely represented that long-term opioid use could improve patients' quality of life;

b. The dissemination via wires and mail of APF's Policymaker's Guide beginning in 2011 and continuing afterward, which misrepresented the risks of addiction and falsely represented that doctors and patients could increase opioid dosages indefinitely without risk;

c. The dissemination via wire of ENDO DEFENDANTS' pamphlet, edited by Russel Portenoy, Understanding Your Pain, available on ENDO DEFENDANTS' website throughout the time period described in this Complaint, which falsely represented that doctors and patients could increase opioid dosages without risk;



108 of 142

d. The dissemination via wires and mail of Responsible Opioid Prescribing, beginning in 2007 and afterward, which promulgated the false concept of pseudoaddiction and falsely represented that long-term opioid use could improve patients' quality of life; and

e. The dissemination via wires and mail of the misrepresentations and false statements described above in paragraphs 71, 84, 103, 94, 109–117, 124, and 135–144.

664. The DEFENDANTS engaged in the violations of the law detailed above to enable the Enterprise to profit from its deceptive creation of the expanded market for opioids.

665. The DISTRIBUTING DEFENDANTS' activities were coordinated and planned with the MANUFACTURING DEFENDANTS, as evidenced by coordinated lobbying efforts to weaken DEA enforcement

666. The PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS and MANUFACTURING DEFENDANTS, through their relationships with one another were aware of the Enterprise's deceptive activity and sought only to enable the Enterprise to profit from it.

667. To do so, the DISTRIBUTING DEFENDANTS engaged in the following predicate acts:

a. CARDINAL's violations of the CSA and federal law concerning the distribution of controlled substances—described above in paragraph 214—in 2008, 2012, and 2016, which resulted in fines, penalties or settlements with the DEA;



109 of 142

b. MCKESSON's violations of the CSA and federal law concerning the distribution of controlled substances—described above in paragraph 215—in 2008 and 2017, which resulted in fines, penalties or settlements with the DEA; and

c. AmerisourceBergen's violations of the CSA and federal law concerning the distribution of controlled substances—described above in paragraph 216—in 2007 and 2012, which resulted in penalties and an investigation by the Department of Justice.

668. Many of the precise dates of coordination has been hidden and cannot be alleged without access to records. Indeed, an essential part of the successful operation of the Enterprise alleged herein depended upon secrecy.

669. The PHARMACY DEFENDANTS and MANUFACTURING DEFENDANTS, the DISTRIBUTING DEFENDANTS, the Front Groups', and KOLs' deceptive activities were coordinated and planned in advance, as evidenced by the Front Groups' and KOLs' misleading statements described above that were supported, funded, or compensated by the MANUFACTURING DEFENDANTS.

670. Many of the precise dates of the MANUFACTURING DEFENDANTS', Front Groups', and KOLs' agreement to violate RICO, however, have been hidden and cannot be alleged without access to the MANUFACTURING DEFENDANTS', the Front Groups', and the KOLs' books and records. Indeed, for the deception to be successful, the coordination between the MANUFACTURING DEFENDANTS and the seemingly independent Front Groups and KOLs had to remain secret.

671. Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had



110 of 142

similar results affecting similar victims, including doctors, insurers, and consumers in New York. The MANUFACTURING DEFENDANTS, the Front Groups, and the KOLs calculated and intentionally crafted the opioids marketing scheme to increase and maintain their increased profits, without regard to the effect such behavior had on Plaintiff and Class Members. The PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS knowingly and intentionally assisted the Enterprise in cashing in on the market that the Enterprise's deceptive conduct created.

672. By intentionally misrepresenting the risks and benefits of using opioids for chronic pain, subsequently failing to disclose such practices, and profiting off of the legal and illegal market that deception created, the PHARMACY DEFENDANTS and MANUFACTURING DEFENDANTS and DISTRIBUTING DEFENDANTS, the Front Groups, and the KOLs engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

**C. Damages**

673. PHARMACY DEFENDANTS and MANUFACTURING DEFENDANTS and DISTRIBUTING DEFENDANTS' violations of law and their pattern of racketeering activity have directly and proximately caused ESTATE PLAINTIFFS and PLAINTIFF CLASS to be injured.

674. But for PHARMACY DEFENDANTS and MANUFACTURING DEFENDANTS and DISTRIBUTING DEFENDANTS', the Front Groups', and the KOLs' racketeering activities, PLAINTIFFS would not have sustained the damages.

675. As a direct and proximate result of PHARMACY DEFENDANTS and MANUFACTURING DEFENDANTS and DISTRIBUTING DEFENDANTS' acts



111 of 142

and/or omissions and/or conduct PLAINTIFFS permitted by RICO, including equitable relief, actual damages, treble damages, and attorneys' fees.

676. As such, PLAINTIFFS are entitled to damages in an amount to be proven at trial.

**<u>THIRD CAUSE OF ACTION</u>**
**Conspiracy to Violate the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, et seq.**
**(ESTATE PLAINTIFFS and PLAINTIFF CLASS as against PHARMACY DEFENDANTS and MANUFACTURING DEFENDANTS and DISTRIBUTING DEFENDANTS)**

677. ESTATE PLAINTIFFS and PLAINTIFF CLASS incorporate, repeat, reiterate, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein at length.

678. At all relevant times, each Defendant is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because they are capable of holding, and do hold, "a legal or beneficial interest in property."

679. Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

680. DEFENDANTS conspired to violate RICO, as alleged more fully above, by agreeing to conduct and participate in the affairs of the Enterprise detailed above.

**A. The Enterprise**

681. Plaintiffs incorporates by reference all applicable paragraphs above concerning the Enterprise.

682. Each of the aforesaid parties to the conspiracy was aware of the scope and nature of the Enterprise and intended to participate in it.

683. The MANUFACTURING DEFENDANTS directed and supported the KOLs and Front Groups in disseminating false and misleading information about the necessity and



112 of 142

risks of opioids, such as the publications supported and financed by the MANUFACTURING DEFENDANTS referenced in Second Cause of Action herein above.

684. The PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS were aware of this deception through their relationships with the MANUFACTURING DEFENDANTS, including through the HDA and PCF's lobbying efforts, and agreed to serve the Enterprise's goals of profiting from this deception.

**B. Pattern of Racketeering Activity**

685. Plaintiff incorporates by reference all applicable paragraphs above concerning the Enterprise. The parties to the conspiracy as set forth above agreed to conduct and participate in the affairs of the Enterprise detailed in those paragraphs.

686. PLAINTIFFS incorporate by reference all applicable paragraphs above, and specifically the paragraphs above concerning the damages caused by the Enterprise.

## FOURTH CAUSE OF ACTION
**Negligence**
**(PLAINTIFFS against all DEFENDANTS)**

687. Plaintiffs incorporate, repeat, reiterate, and reallege each and every allegation contained in the paragraphs above as if fully set forth herein at length.

688. At all relevant times, DEFENDANTS had a duty to DECEDENT ALIOTTA and PLAINTIFF CLASS to provide a safe and/or safely manufactured product, and to notify the FDA of flaws, and to warn the FDA and the DECEDENT ALIOTTA and PLAINTIFF CLASS of the dangers of the use of opioid medications.



113 of 142

689. At all relevant times, DEFENDANTS had a duty to exercise reasonable care in manufacturing, selling and distributing highly dangerous medications in the State of New York.

690. The MANUFACTURING DEFENDANTS knew and should have known that misleading patients about the safety and efficacy of opioids for long-term pain treatment would cause addiction and significant harm and death.

691. DISTRIBUTING DEFENDANTS knew and should have known that allowing the distribution of large quantities of opioids would cause significant addiction and significant harm and death.

692. PHARMACY DEFENDANTS knew and should have known that allowing the distribution of large quantities of opioids would cause significant addiction and significant harm and death.

693. PHYSICIAN DEFENDANTS knew and should have known that allowing the distribution of large quantities of opioids would cause significant addiction and significant harm and death.

694. he MANUFACTURING DEFENDANTS breached their duty to DECEDENT ALIOTTA and PLAINTIFF CLASS through their false and misleading promotion of opioids and their deceptive marketing scheme, misrepresenting the nature of the drugs and aggressively promoting them for chronic pain.

695. he DISTRIBUTING DEFENDANTS breached their duty to DECEDENT ALIOTTA and PLAINTIFF CLASS to conform their behavior to the legal standard of reasonable conduct under the circumstances, in the light of the apparent risks, as well as



114 of 142

through their failure to comply with New York and federal laws protecting against diversion of controlled substances.

696. The DEFENDANTS conduct caused opioids to become widely available and widely used, and DEFENDANTS' actions were, at the very least, a substantial factor in the widespread abuse of opioids, and the death of the DECEDENT ALIOTTA and PLAINTIFF CLASS.

697. DEFENDANTS breached their duty of reasonable care to DECEDENT ALIOTTA and PLAINTIFF CLASS by defectively designing, manufacturing, and/or negligently failing to warn of know defects or adverse effects of opioid medications, causing PLAINTIFFS injuries and damages.

698. DEFENDANTS breached their duty of reasonable care to PLAINTIFFS by manufacturing opioid medications in such a manner that they were highly addictive and thus exposed Plaintiffs and PLAINTIFF CLASS to severe and lasting physical trauma and injuries.

699. DEFENDANTS breached their duty of reasonable care to PLAINTIFFS by failing to promptly and adequately notify the FDA and warn and instruct PLAINTIFFS in a manner to protect them from addiction and death.

700. DEFENDANTS breached their duty of reasonable care to PLAINTFIFS by failing to exercise due care under the circumstances.

701. As described above, DEFENDANTS' breach caused and proximately caused damages to PLAINTIFFS.

702. As a direct and proximate result of DEFENDANTS wrongful misconduct, PLAINTIFFS and have sustained and will continue to sustain severe physical injuries,



115 of 142

severe emotional distress, mental anguish, economic losses, addiction, death and other damages for which they are entitled to compensatory and equitable damages in an amount to be proven at trial.

703. PLAINTIFFS are also entitled to consequential damages in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
***Per Se* Negligence & Strict Liability**
**(PLAINTIFFS as against DEFENDANTS)**

704. PLAINTIFFS incorporate, repeat, reiterate, and reallege each and every allegation contained in the paragraphs above as if fully set forth herein at length.

705. The acts and/or omissions of the DEFENDANTS, as set forth herein, violated the statutes and/or regulations made and provided under the laws of the State of New York and the federal laws of the United States of America, which pertain to the manufacture, design, testing, assembly, inspection, labeling, packaging, supplying, marketing, selling, advertising, distributing, preparation of, use of, and warning regarding the risks and dangers, of opioid medications, and otherwise with regard to the prescribing and/or selling and/or distributing opioid medications.

706. DEFENDANTS had an obligation to not violate the law in the manufacture, design, testing, assembly, inspection, labeling, packaging, supplying, marketing, selling, advertising, preparing for use, warning of the risks and dangers of opioid medications, and otherwise prescribing and/or selling and/or distributing opioid medications.

707. The applicable statutes and/or regulations which apply under the laws of the State of New York and the federal laws of the United States of America provide for a criminal



116 of 142

or administrative penalty (i.e., license suspension, fines or imprisonment) but not for civil penalty.

708. DEFENDANTS' acts and omissions constitute a breach of duty under the aforesaid statutes and/or regulations subjecting DEFENDANTS to civil liability for all damages arising therefrom.

709. DECEDENT ALIOTTA and PLAINTIFF CLASS, as a purchaser and/or user of opioid medications, are within the class of persons the aforesaid statutes and are designed to protect and the injuries of PLAINTIFFS are the type of harm these statutes and regulations are designed to prevent.

710. As a result of all of the foregoing, the DEFENDANTS' acts and/or omissions, as set forth fully herein, constitute *per se* negligence.

711. As a direct and proximate result of DEFENDANTS' acts and/or omissions and/or conduct, PLAINTIFFS have sustained and will continue to sustain severe emotional distress, mental anguish, economic losses, addiction, death and other damages for which they are entitled to consequential, compensatory and equitable damages and/or declaratory relief in an amount to be proven at trial.

712. PLAINTIFFS are also entitled to damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
**(Negligent Misrepresentation)**
**(PLAINTIFFS as against DEFENDANTS)**

713. PLAINTIFFS incorporate, repeat, reiterate, and reallege each and every allegation contained in the paragraphs above as if fully set forth herein at length.

714. At the time DEFENDANTS prescribed, manufactured, designed, marketed, sold and distributed prescription opioid medications for use, and they knew or should have



117 of 142

known of the use for which said medications were intended, and the serious risks and dangers associated with such use.

715. DEFENDANTS owed a duty to the ultimate end-users of prescription opioid medications to accurately and truthfully represent the risks of prescription opioid medications.

716. DEFENDANTS breached that duty by misrepresenting and/or failing to adequately warn Plaintiff's physicians, the medical community, the DECEDENT ALIOTTA and members of the PLAINTIFF CLASS, and the public about the risks of prescription opioid medications, which DEFENDANTS knew or in the exercise of diligence should have known.

717. As a direct and proximate result of DEFENDANTS ' wrongful conduct, PLAINTIFFS sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages for which

718. PLAINTIFFS are entitled to compensatory damages in an amount to be proven at trial.

719. PLAINTIFFS are entitled to consequential damages in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**
**Intentional Misrepresentation**
**(PLAINTIFFS as against DEFENDANTS)**

720. Plaintiffs incorporate, repeat, reiterate, and reallege each and every allegation contained in the paragraphs above as if fully set forth herein at length.

721. DEFENDANTS, having undertaken to prescribe, prepare, design, research, develop, manufacture, inspect, label, market, promote and sell prescription opioid



118 of 142

medications, owed a duty to provide accurate and complete information to physicians and the public regarding prescription opioid medications.

722. However, DEFENDANTS misled PLAINTIFFS into believing that prescription opioid medications was safe and effective for use with chronic pain; engaged in deceptive, misleading and unconscionable promotional or sales methods to convince PLAINTIFFS to use prescription opioid medications, even though DEFENDANTS knew or should have known that prescription opioid medications was unreasonably unsafe.

723. DEFENDANTS also failed to warn PLAINTIFFS about the safety risks of prescription opioid medications they designed, marketed, prescribed and sold.

724. DEFENDANTS' advertising program and promotional items, by containing affirmative misrepresentations and omissions, falsely and deceptively sought to create the image and impression that prescription opioid medications was safe for human use, had no unacceptable side effects, and would not interfere with daily life.

725. DEFENDANTS purposefully concealed, failed to disclose, misstated, downplayed and understated the health hazards and risks associated with the use of prescription opioid medications.

726. DEFENDANTS, through promotional practices as well as the publication of medical literature, deceived PLAINTIFFS.

727. PLAINTIFFS falsely and deceptively kept relevant information from PLAINTIFFS regarding the safety of prescription opioid medications.

728. DEFENDANTS expressly denied that prescription opioid medications created an increased risk of injury and took affirmative steps to prevent the discovery and



119 of 142

dissemination of any evidence on the increased likelihood of injury from prescription opioid medications to PLAINTIFFS.

729. DEFENDANTS did not accurately report the results of adverse events by fraudulently and intentionally withholding from PLAINTIFFS, all the while undertaking a major advertising campaign to sell prescription opioid medications.

730. DEFENDANTS received reports of prescription opioid medications defects from various sources and intentionally withheld this information, while continuing to sell prescription opioid medications for implantation in individuals such as PLAINTIFFS.

731. Further, even as DEFENDANTS disclosed some information regarding prescription opioid medications defects, the disclosures were incomplete and misleading.

732. DEFENDANTS effectively deceived and misled the scientific and medical communities regarding the risks and benefits of prescription opioid medications.

733. DEFENDANTS failed to fully inform PLAINTIFFS of the true defects in prescription opioid medications, defects that were known to DEFENDANTS.

734. Through the materials they disseminated, DEFENDANTS falsely and deceptively misrepresented or omitted a number of material facts regarding prescription opioid medications.

735. DEFENDANTS possessed evidence demonstrating prescription opioid medications caused serious adverse side effects.

736. Nevertheless, DEFENDANTS continued to market, sell, distribute and advertise prescription opioid medications by providing false and misleading information with regard to its safety and/or by intentionally withholding information regarding the dangers.



120 of 142

737. DEFENDANTS engaged in all the acts and omissions described above with the intent that PLAINTIFFS would rely on the misrepresentations, deceptions and concealments in deciding to use opioid prescription medications rather than another product or a competitors' similar product.

738. PLAINTIFFS justifiably relied to their detriment on DEFENDANTS intentional and fraudulent misrepresentations and omissions as set out above.

739. This reliance proximately caused the injuries and damages described in this Complaint.

740. As a direct and proximate result of DEFENDANTS wrongful conduct, PLAINTIFFS sustained and will continue to sustain severe physical injuries, addiction and death.

741. In addition, PLAINTIFFS suffered and will continue to suffer severe emotional distress, mental anguish, conscious pain and suffering, economic losses, addiction, death and other damages for which they are entitled to compensatory damages and in an amount to be proven at trial.

742. As such, PLAINTIFFS are entitled to consequential damages in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION
**Constructive Fraud**
**(Plaintiffs as against all DEFENDANTS)**

743. PLAINTIFFS incorporate, repeat, reiterate, and reallege each and every allegation contained in the paragraphs above as if fully set forth herein at length.

744. At the time DEFENDANTS sold and/or prescribed prescription opioid medications to the DECEDENT ALIOTTA and members of the PLAINTIFF CLASS.



121 of 142

745. DEFENDANTS were in a unique position of knowledge concerning the safety and effectiveness of prescription opioid medications, which knowledge was not possessed by DECEDENT ALIOTTA and members of the PLAINTIFF CLASS, and thereby held a position of superiority over PLAINTIFFS.

746. Through their unique knowledge and expertise regarding the use, dangers, and defective nature of prescription opioid medications, and through their statements to DECEDENT ALIOTTA and members of the PLAINTIFF CLASS, and in advertisements, promotional materials, and other communications, DEFENDANTS professed that they had knowledge of the truth: that prescription opioid medications were safe and effective for their intended uses and were not defective.

747. DEFENDANTS made these representations to the DECEDENT ALIOTTA and members of the PLAINTIFF CLASS.

748. DEFENDANTS' representations and omissions to DECEDENT ALIOTTA and members of the PLAINTIFF CLASS, included unqualified statements made to, or which did, induce DECEDENT ALIOTTA and members of the PLAINTIFF CLASS to purchase and use prescription opioid medications.

749. DECEDENT ALIOTTA and members of the PLAINTIFF CLASS relied upon the representations and statements made when using opioid prescription medications.

750. DEFENDANTS took unconscionable advantage of their dominant position of knowledge with regard to DECEDENT ALIOTTA and members of the PLAINTIFF CLASS and engaged in constructive fraud in their relationship with DECEDENT ALIOTTA and members of the PLAINTIFF CLASS.



122 of 142

751. DECEDENT ALIOTTA and members of the PLAINTIFF CLASS reasonably relied on MANUFACTURING DEFENDANTS' representations.

752. As a direct and proximate result of DEFENDANTS' wrongful conduct, PLAINTIFFS sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses, conscious pain and suffering, and other damages for which PLAINTIFFS are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

753. PLAINTIFFS are entitled to consequential damages in an amount to be proven at trial.

**NINTH CAUSE OF ACTION**
**Civil Conspiracy**
**(Plaintiffs as against all DEFENDANTS)**

754. Plaintiffs incorporate, repeat, reiterate, and reallege each and every allegation contained in the paragraphs above as if fully set forth herein at length.

755. As set forth above, DEFENDANTS have committed torts against PLAINTIFFS, including violations of GBL § 349, violations of RICO, conspiracy to violate RICO, public nuisance, unjust enrichment, negligence, and tortious interference with prospective economic advantage.

756. The MANUFACTURING DEFENDANTS and DISTRIBUTING DEFENDANTS have engaged, and continue to engage, in a massive marketing campaign to misstate and conceal the risks of treating chronic pain with opioids.

757. Their aggressive marketing campaign enabled DEFENDANTS to overcome the longstanding medical consensus that opioids were unsafe for the treatment of chronic pain and resulted in a significant increase in the number of opioids prescribed nationwide.



123 of 142

758. In response to and in conjunction with this increased demand, the PHYSICIA DEFENDANTS increased and continued to prescribe opioids, often time which were medically unnecessary.

759. In addition, the PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS continuously supplied prescription opioids. These transactions occurred despite the PHARMACY DEFENDANTS DISTRIBUTING DEFENDANTS having actual or constructive knowledge that they were habitually breaching their common law and statutory duties.

760. None of the DEFENDANTS would have succeeded in profiting so significantly from the opioid epidemic without the concerted conduct of the other DEFENDANTS.

761. As a result of the concerted action between the DEFENDANTS, New York law was continually violated.

762. DEFENDANTS formed an agreement to commit the aforementioned overt and unlawful acts in a common scheme.

763. DEFENDANTS commissioned the aforementioned unlawful acts.

764. As a direct and proximate result of DEFENDANTS' wrongful conduct, PLAINTIFFS sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses, conscious pain and suffering, and other damages for which PLAINTIFFS are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

765. PLAINTIFFS are entitled to consequential damages in an amount to be proven at trial.

## TENTH CAUSE OF ACTION
**Failure to Warn and Instruct**
**(PLAINTIFFS as against DEFENDANTS)**



124 of 142

766. PLAINTIFFS incorporate, repeat, reiterate, and reallege each and every allegation contained in the paragraphs above as if fully set forth herein at length.

767. At all relevant times hereto, MANUFACTURING DEFENDANTS engaged in the development, testing, manufacturing, marketing and sales of opioid medications.

768. MANUFACTURING DEFENDANTS designed, manufactured, assembled and sold opioid medications to medical professionals and patients knowing that they would then be prescribed by doctors to patients in need of pain relief.

769. MANUFACTURING DEFENDANTS and PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS distributed and/or sold opioid medications in the condition in which it left its place of manufacture, in its original form of manufacture.

770. PHYSICIAN DEFENDANTS prescribed, often times with no medical necessity, opioids.

771. Opioid medications were designed, developed, tested, manufactured, marketed prescribed and sold or otherwise placed into the stream of commerce by DEFENDANTS in a dangerous and defective condition and posed a threat to any user or consumer of same.

772. Defects, including propensities for addiction, existed in the opioid medications at the time they were purchased and used by the DECEDENT ALIOTTA and member of the PLAINTIFF CLASS.

773. DECEDENT ALIOTTA and all members of the PLAINTIFF CLASS were in a class of persons that DEFENDANTS should have considered to be subject to the harm caused by the defective nature of the opioid medications.



125 of 142

774. The defective opioid medications were expected to, and did, reach DECEDENT ALIOTTA and all members of the PLAINTIFF CLASS without substantial change in condition from their original manufacture and sale.

775. The opioid medications were distributed, prescribed and/or sold by DEFENDANTS with the knowledge that they were dangerous and defective for the purposes they were being marketed, sold, distributed and prescribed.

776. The opioid medications, despite being used in the manner for which they were promoted, caused significant injury and damages to DECEDENT ALIOTTA and all members of the PLAINTIFF CLASS.

777. At the time and on the occasions in question, the opioid medications were properly used for the purpose for which they were intended, but they were in fact defective, unsafe and unreasonably dangerous for the purposes for which they were marketed, and/or sold/ and/or prescribed.

778. The opioid medications marketed, and/or sold/ and/or prescribed and placed into the stream of commerce caused the death of the DECEDENT ALIOTTA and all members of the PLAINTIFF CLASS.

779. DEFENDANTS knew or should have known through testing, adverse event reporting, or otherwise, that the opioid medications created a high risk of addiction and resulting death.

780. The foreseeable risk of harm from the defects in the opioid medications could have been reduced or avoided by providing accurate and adequate instructions or warnings.



126 of 142

781. At all relevant times, and those during which DEFENDANTS began marketing, selling and distributing opioid medications in the United States, the marketing materials, product labeling and product information for the opioid medications failed to contain adequate information, instructions, and warnings concerning use of the products and the risks associated with same.

782. DEFENDANTS failed to provide adequate and timely warnings or instructions regarding opioid medications and their known defects, to both doctors and health care providers, as well as the DECEDENT ALIOTTA and all members of the PLAINTIFF CLASS.

783. DEFENDANTS failed to inform DECEDENT ALIOTTA and all members of the PLAINTIFF CLASS in the United States and New York the dangers of opioid medications, and instead continued to promote opioid medications in ways which were contrary to their knowledge of their potential adverse effects.

784. DEFENDANTS failed to inform DECEDENT ALIOTTA and all members of the PLAINTIFF CLASS using opioid medications could suffer adverse effects, including addiction and death.

785. DEFENDANTS intentionally failed to warn DECEDENT ALIOTTA and all members of the PLAINTIFF CLASS that opioid medications could suffer adverse effects, including addiction and death.

786. DEFENDANTS failed to provide DECEDENT ALIOTTA and all members of the PLAINTIFF CLASS adequate instructions or warnings regarding the use of opioid medications which were known by or should have been known.



127 of 142

787. As a direct and proximate result of the intentional acts and/or omissions of the DEFENDANTS, as well as the lack of reasonable and adequate instructions or warnings regarding the defects and potentially adverse effects of the use of opioid medications, PLAINTIFFS have suffered injuries, including but not limited to addiction and death.

788. PLAINTIFFS have incurred damages, including mental and physical pain and suffering, the deceased's lost wages, and funeral and burial expenses, conscious pain and suffering.

789. PLAINTIFFS are entitled to compensatory and economic damages in an amount to be proven at trial.

**ELEVENTH CAUSE OF ACTION**
**Breach of Implied Warranty**
**(ESTATE PLAINTIFF and PLAINTIFF CLASS as against all MANUFACTURING DEFENDANTS)**

790. PLAINTIFFS incorporate, repeat, reiterate, and reallege each and every allegation contained in the paragraphs above as if fully set forth herein at length.

791. MANUFACTURING DEFENDANTS impliedly warranted that prescription opioid medications, which MANUFACTURING DEFENDANTS designed, manufactured, assembled, promoted and sold to Plaintiff and his physicians, was merchantable and fit and safe for ordinary use.

792. MANUFACTURING DEFENDANTS further impliedly warranted that prescription opioid medications, which MANUFACTURING DEFENDANTS designed, manufactured, assembled, promoted and sold to Plaintiff and his physicians was fit for the particular purposes for which it was intended and was sold.



128 of 142

793. Contrary to these implied warranties, prescription opioid medications were defective, unmerchantable, and unfit for its ordinary use when sold, and unfit for the particular purpose for which it was sold.

794. As a direct and proximate result of MANUFACTURING DEFENDANTS' wrongful conduct, PLAINTIFFS have sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses addiction, death and other damages for which he is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

795. PLAINTIFFS are entitled to statutory and consequential damages in an amount to be proven at trial.

**TWELFTH CAUSE OF ACTION**
**Breach of Express Warranty**
**(ESTATE PLAINTIFFS and PLAINTIFF CLASS as against MANUFACTURING DEFENDANTS and PHARMACY DEFENDANTS and DISTRIBUTING DEFENDANTS)**

796. PLAINTIFFS incorporate, repeat, reiterate, and reallege each and every allegation contained in the paragraphs above as if fully set forth herein at length.

797. DEFENDANTS and/or their authorized agents or sales representatives, in publications, package inserts, and other communications intended for PLAINTIFF that prescription opioid medications was safe, effective, fit and proper for its intended use.

798. These warranties and representations were false in that prescription opioid medications were not safe and was unfit for the uses for which it was intended.

799. Through sale of prescription opioid medications, DEFENDANTS are merchants pursuant to Section 2-314 of the Uniform Commercial Code.

800. DEFENDANTS breached their warranty of the mechanical soundness of prescription opioid medications by continuing prescribing, sales and marketing



129 of 142

campaigns highlighting the safety and efficacy of their product, while they knew of the defects and risk of product failure and resulting patient injuries.

801. As a direct and proximate result of DEFENDANTS ' wrongful conduct, PLAINTIFFS has sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses, addiction, death and other damages for which he is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

802. PLAINTIFF is entitled to consequential damages in an amount to be proven at trial.

## THIRTEENTH CAUSE OF ACTION
## Medical Malpractice
## (PLAINTIFFS as against PHYSICIAN DEFENDANTS)

803. PLAINTIFFS incorporate, repeat, reiterate, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein at length.

804. PHYSICIAN DEFENDANTS failed to properly monitor the administration of opioid medications, overprescribed opioid medications, failed to properly analyze the background and history of their patients, and went against previously medical norms and contributed to the crisis.

805. That the medical care, diagnosis, treatment and services that PHYSICIAN DEFENDANTS rendered to DECEDENT ALIOTTA and the other members of the PLAINTIFF CLASS, were rendered in a manner that departed from good and accepted medical practice, and constituted professional medical malpractice, without any fault or lack of care on the part of DECEDENT ALIOTTA and the other members of the PLAINTIFF CLASS, herein.



130 of 142

806. That PHYSICIAN DEFENDANTS, by performing required medical duties and responsibilities in a professionally reckless, wanton, willful and grossly negligent manner, caused and permitted the sequelae of DECEDENT ALIOTTA's, and the members of the PLAINTIFF CLASS, addiction to pain medications, which led to DECENDENT ALIOTTA's death on August 30, 2017 and the deaths of the PLAINTIFF CLASS.

807. That as a direct result and proximate cause of the PHYSICIAN DEFENDANTS performing required medical duties and responsibilities in a professionally reckless, wanton, willful and grossly negligent manner, DECEDENT ALIOTTA's, and the members of the PLAINTIFF CLASS sustained great pain, agony, injury, suffering, disability, as well as mental anguish and emotional distress, all of which caused, precipitated and contributed to DECENDENT ALIOTTA's death on August 30, 2017 and the deaths of the PLAINTIFF CLASS.

808. That during the DECENDENT ALIOTTA's and the deaths of the PLAINTIFF CLASS treatment and medical care, PHYSICIAN DEFENDANTS failed to properly take a meaningful medical history, obtain prior and current medical records and toxicology reports from other providers concerning the pain management treatment she received or was receiving from them, and failed to keep accurate medical records throughout the course of her medical treatment with same.

809. That during the DECENDENT ALIOTTA's and the deaths of the PLAINTIFF CLASS, PHYSICIAN DEFENDANTS failed to properly treat the DECEDENT ALIOTTA and the members of the PLAINTIFF CLASS for her pain.



131 of 142

810. That during the DECEDENTS ALIOTTA's, and the members of the PLAINTIFF CLASS' treatment and medical care, PHSYICIAN DEFENDANTS prescribed excessive and unnecessary prescription pain medications and controlled substances known to be highly addictive.

811. That during the DECEDENTS ALIOTTA's, and the members of the PLAINTIFF CLASS' treatment and medical care, PHSYICIAN DEFENDANTS knew, or should have known, that he was prescribing excessive and unnecessary prescription pain medications and controlled substances known to be highly addictive.

812. That during the DECEDENTS ALIOTTA's, and the members of the PLAINTIFF CLASS' treatment and medical care, PHSYICIAN DEFENDANTS failed to ascertain whether they were receiving similar prescriptions from any other sources.

813. That during the DECEDENTS ALIOTTA's, and the members of the PLAINTIFF CLASS' treatment and medical care, PHSYICIAN DEFENDANTS failed to ascertain whether they were using similar prescriptions from any other sources.

814. That during the DECEDENTS ALIOTTA's, and the members of the PLAINTIFF CLASS' treatment and medical care, PHSYICIAN DEFENDANTS failed to monitor or reassess treatment and/or diagnose DECEDENT ALIOTTA and the members of the PLAINTIFF CLASS for the cause(s) of their pain.

815. That during the DECEDENTS ALIOTTA's, and the members of the PLAINTIFF CLASS' treatment and medical care, PHSYICIAN DEFENDANTS failed to consult with DECEDENT ALIOTTA and the members of the PLAINTIFF CLASS prior and current physicians regarding her prior and current usage of prescription pain medications and controlled substances, as well as the medical conditions that brought on such usage.



132 of 142

816. That during the DECEDENTS ALIOTTA's, and the members of the PLAINTIFF CLASS' treatment and medical care, PHSYICIAN DEFENDANTS knew or should have known that they was becoming and/or was addicted to prescription pain medications and controlled substances, yet they continued to prescribe them high doses and quantities of pills with a wanton and reckless disregard to the impact that the pills were having on them health and overall well-being physically and emotionally.

817. That during the DECEDENTS ALIOTTA's, and the members of the PLAINTIFF CLASS' treatment and medical care, PHSYICIAN DEFENDANTS knew or should have known that they were using illegal and recreational drugs, yet PHYSICIAN DEFENDANST continued to prescribe her high doses and quantities of highly addictive pain medications and controlled substances with a conscious disregard to the effect that the combination of these of illegal and recreational drugs and prescription drugs were having on their health and overall well-being physically and emotionally.

818. That during the DECEDENTS ALIOTTA's, and the members of the PLAINTIFF CLASS' treatment and medical care, PHSYICIAN DEFENDANTS failed to counsel them on the use of prescription pain medications and highly addictive controlled substances, as well as the dangers associated with their use.

819. That during the DECEDENTS ALIOTTA's, and the members of the PLAINTIFF CLASS' treatment and medical care, PHSYICIAN DEFENDANTS knew or should have known that persons addicted to prescription pain medications and controlled substances being used both alone and in combination with other drugs are prone to overdose, which could lead to death.



133 of 142

820. That in addition to the foregoing, PHYSICIAN DEFENDANTS failed to abide by accepted medical standards, in the care and treatment of DECEDENT ALIOTTA and the members of the PLAINTIFF CLASS, in the following manners: the failure to timely and properly evaluate their condition; the failure to timely and properly administer medications in a prudent and medically-accepted manner; the failure to perform appropriate testing; the failure to timely and properly diagnose and treat them; the failure to timely appreciate their condition and failing health; the failure to timely and properly formulate a differential diagnosis; the failure to timely and properly visualize their anatomy; the failure to timely and properly monitor them; the failure to timely and properly seek and/or obtain advice from experienced and competent medical professionals; the failure to take and/or record a proper and adequate history; the failure to pay heed to and/or act upon signs, symptoms and/or complaints; the failure to timely and/or adequately monitor their vital signs, urine, physical conditions, weight loss, blood pressure and/or neurologic and psychological status; the failure to properly treat the conditions of the decedent.

821. At all relevant times herein, DECEDENT ALIOTTA and the members of the PLAINTIFF CLASS sustained severe and serious personal injuries and was caused to suffer severe physical pain and mental anguish as a result of the foregoing.

822. As a result, DECEDENT ALIOTTA and the members of the PLAINTIFF CLASS were incapacitated from attending her regular activities and experienced a loss of enjoyment of life until their deaths.

823. The aforesaid actions of PHSYICIAN DEFENDANTS were a direct and proximate cause of DECEDENT ALIOTTA's and the members of the PLAINTIFF



134 of 142

CLASS significant conscious pain and suffering, personal injury, severe emotional damage, mental anguish, addiction and death.

824. By reason of the above, the PLAINTIFFS, sets forth specifically, a substantial cause of action for damages, both general and special, for DECEDENT ALIOTTA' s, and the members of the PLAINTIFF CLASS, pain, suffering, personal injuries and expense, with said damages totaling an amount that exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction of this matter.

825. This cause of action falls within the exceptions to Article 16 of the New York Civil Practice Laws and Rules.

## FOURTEENTH CAUSE OF ACTION
**Failure to Warn and Instruct**
**(Plaintiffs as against all DEFENDANTS)**

826. ESTATE PLAINTIFFS and PLAINTIFF CLASS incorporate, repeat, reiterate, and reallege each and every allegation contained in the paragraphs above as if fully set forth herein at length.

827. The defective opioid medications were expected to, and did, reach ESTATE PLAINTIFFS and PLAINTIFF CLASS without substantial change in condition from their original manufacture and sale.

828. The opioid medications were manufactured by the MANUFACTURING DEFENDANTS with the knowledge that they were dangerous and defective for the purposes they were being manufactured.

829. The opioid medications were distributed and sold by the the DISTRIBUTING DEFENDANTS and PHARMACY DEFENDANTS with the knowledge that they were dangerous and defective for the purposes they were being distributed and/or sold.



135 of 142

830. The opioid medications were prescribed by PHSYICIAN DEFENDANTS with the knowledge that they were dangerous and defective for the purposes they were being prescribed.

831. The opioid medications, despite being used in the manner for which they were intended, caused significant injury and damages to DECEDENT ALIOTTA and the members of the PLAINTIFF CLASS.

832. The opioid medication prescriptions were filled by PHARMACY DEFENDANTS with the knowledge that they were dangerous and defective for the purposes they were being prescribed.

833. The opioid medications, despite being used in the manner for which they were intended, caused significant injury and damages, including addiction and death, to DECEDENT ALIOTTA and PLAINTIFF CLASS.

834. At the time and on the occasions in question, the opioid medications were properly used for the purpose for which they were intended, but they were in fact defective, unsafe and unreasonably dangerous for the purposes for which they were prescribed.

835. The opioid medications caused the death of the DECEDENT ALIOTTA, and members of the PLAINTIFF CLASS.

836. DEFENDANTS knew or should have known that the opioid medications created a high risk of addiction and resulting death.

837. The foreseeable risk of harm from the defects in the opioid medications could have been reduced or avoided by providing accurate and adequate instructions or warnings.



136 of 142

838. DEFENDANTS failed to provide adequate and timely warnings or instructions regarding opioid medications to the DECEDENT ALIOTTA and PLAINTIFF CLASS.

839. DEFENDANTS negligently or intentionally failed to warn the DECEDENT ALIOTTA and PLAINTIFF CLASS that opioid medications could suffer adverse effects, including addiction and death.

840. DEFENDANTS failed to provide adequate instructions or warnings regarding the use of opioid medications to the DECEDENT ALIOTTA which were known by or should have been known to same.

841. As a direct and proximate result of the intentional acts and/or omissions of the DEFENDANTS, including the lack of reasonable and adequate instructions or warnings regarding the defects and potentially adverse effects of the use of opioid medications, DECEDENT ALIOTTA and PLAINTIFF CLASS have suffered injuries.

842. As such PLAINTIFFS have incurred damages, including mental and physical pain and suffering, lost wages, and funeral and burial expenses.

843. As such PLAINTIFFS are entitled to compensatory and economic damages in an amount to be proven at trial.

**FIFTEENTH CAUSE OF ACTION**
**Wrongful Death**
**(PLAINTIFFS as against all DEFENDANTS)**

844. PLAINTIFFS incorporate, repeat, reiterate, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein at length.

845. Based upon all of the foregoing, including the recklessness, wanton, willful and grossly negligent conduct of the DEFENDANTS proximately caused, precipitated and/or hastened the death of DECEDENT ALIOTTA and the deaths of the members of the PLAINTIFF CLASS.



137 of 142

846. That the aforesaid conduct of DEFENDANTS exhibited a conscious disregard for the health, safety and well-being of the DECEDENT ALIOTTA and the PLAINTIFF CLASS, and as such, proximately caused, precipitated and/or hastened the death of the DECEDENT ALIOTTA and members of the PLAINTIFF CLASS.

847. That the aforesaid conduct of DEFENDANTS exhibited a conscious disregard for the health, safety and well-being of the DECEDENT ALIOTTA and PLAINTIFF CLASS, and all persons so situated who died as a result of their uses of opioid medications.

848. By reason of the above, the Plaintiffs set forth specifically a substantial cause of action for damages, both general and special, for the conscious pain, suffering and wrongful death of DECEDENT ALIOTTA and members of the PLAINTIFF CLASS, with said damages totaling an amount that exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction of this matter.

849. By reason of the foregoing, PLAINTIFFS have sustained great and pecuniary loss and damage, and as such, the PLAINTIFFS specifically sets forth a substantial cause of action for damages as a result of wrongful death of the DECEDENT ALIOTTA and members of the PLAINTIFF CLASS.

850. This cause of action falls within the exceptions to Article 16 of the New York Civil Practice Laws and Rules.

**SIXTENTH CAUSE OF ACTION**
**Loss of Services and Consortium**
**(ESTATE PLAINTIFFS and PLAINTIFF CLASS as against All DEFENDANTS)**

851. ESTATE PLAINTIFFS and PLAINTIFF CLASS died leaving their next of kin.



138 of 142

852. As a result of the foregoing negligence and gross negligence of the DEFENDANTS, decendents' next of kin have been damaged, including, but not limited to, pecuniary losses due to the wrongful death of ESTATE PLAINTIFFS and PLAINTIFF CLASS, in a sum, which exceeds the jurisdictional limits of all lower courts, which would otherwise have jurisdiction.

853. All distributees have suffered loss of inheritance and loss of household services.

854. The children of the deceased have suffered the loss of parental guidance and support.

855. As a result of the foregoing, PLAINTIFFS have been damaged, including punitive damages, in an amount which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

## SEVENTEENTH CAUSE OF ACTION
**Punitive Damages**
**(PLAINTIFFS as against DEFENDANTS)**

856. PLAINTIFFS incorporate, repeat, reiterate, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein at length.

857. DEFENDANTS misrepresentations included knowingly withholding material information from the medical community and the public, including DECEDENT ALIOTTA and members of the PLAINTIFF CLASS herein, concerning the safety and efficacy of opioid medications.

858. At all times material hereto, DEFENDANTS knew and recklessly disregarded the fact that the opioid medications were dangerous, addictive and life threatening.

859. Notwithstanding the foregoing, DEFENDANTS continued to aggressively market, distribute and sell opioid medications without disclosing the aforesaid side



139 of 142

effects and risks to DECEDENT ALIOTTA and members of the PLAINTIFF CLASS, when there were safer alternative methods and products available.

860. The acts of DEFENDANTS were willful and wanton, malicious, and showed a total disregard for human life and human suffering.

861. DEFENDANTS actions showed willful misconduct, malice, fraud, wantonness, oppression, or that demonstrated entire want of care raises the presumption of conscious indifference to the consequences.

862. DEFENDANTS knew or should have known, in light of the surrounding circumstances, that their conduct would naturally and probably result in injury and death.

863. DEFENDANTS continued such conduct with malice and/or in reckless disregard of the consequences, from which malice may be inferred.

864. On the basis of all of the foregoing, PLAINTIFFS should be awarded punitive damages against DEFENDANTS to deter similar conduct.

865. As a direct and proximate result of the DEFENDANTS conscious and deliberate disregard for the rights and safety of consumers, including ESTATE PLAINTIFF and PLAINTIFF CLASS, PLAINTIFFS suffered severe and permanent injuries as set forth above.

866. The aforesaid conduct of DEFENDANTS was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including DECEDENT ALIOTTA and members of the PLAINTIFF CLASS herein, thereby entitling PLAINTIFFS to punitive damages in an amount appropriate to punish DEFENDANTS and deter them from similar conduct in the future.



140 of 142

867. On the result of all of the foregoing, the PLAINTIFFS are entitled to punitive damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for a judgment and/or order as follows:

a. that the claims brought by PLAINTIFF CLASS may be maintained as a class action;

b. That DEFENDANTS have been found to engaged in the actions complained of herein.

c. Awarding PLAINTIFFS a sum equal to any and all money acquired by DEFENDANTS' unlawful, unfair, and deceptive business practices within the State of New York;

d Awarding PLAINTIFFS a sum equal to any and all of all money acquired by the DEFENDANTS for any and all profits unjustly retained by DEFENDANTS via their related business activities in the State of New York;

e. Awarding PLAINTIFFS all damages caused to PLAINTIFFS as compensation for both economic and non-economic losses, as set forth herein, including but not limited to medical expenses, loss of earnings, pain and suffering, conscious pain and suffering, mental anguish and emotional distress, and loss of services and consortium, in such amounts as may be proven at trial;

g. Awarding PLAINTIFFS exemplary and/or treble and/or punitive damages in such amounts as may be proven at trial;

h. Awarding PLAINTIFFS their reasonable litigation expenses and attorneys' fees and the costs of this action;

i. Awarding PLAINTIFFS pre and post-judgment interest, to the extent allowable by law; and

j. Awarding PLAINTIFFS any and all further relief, both legal and equitable, that the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a jury trial for all claims so triable.

Dated: New York, NY
August 28, 2019

C. Cardillo, P.C.
*Attorneys for Plaintiffs*

/s/ Christopher Cardillo, Esq.
By Christopher Cardillo, Esq.



141 of 142

9728 3rd Avenue, Suite 308
Brooklyn, NY 11209
T. 646-398-5025
C. 347-309-0000
Email: cardilloesq@gmail.com



142 of 142